HOLLAND & KNIGHT LLP
Marne S. Sussman, Esq. (SBN 273712)
*marne.sussman@hklaw.com*
Brian C. Bunger, Esq. (SBN 142001)
*brian.bunger@hklaw.com*
Emily M. Lieban, Esq. (SBN 303079)
*emily.lieban@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: 415.743.6900
Facsimile: 415.743.6910

Attorneys for Plaintiff CALIFORNIA
TRUCKING ASSOCIATION

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, a California corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CALIFORNIA AIR RESOURCES BOARD; STEVEN S. CLIFF, in his official capacity, and DOES 1 through 25, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**JURISDICTION**

1.     The claims asserted herein arise under, *inter alia*, the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.,* the Federal Aviation Administration Authorization Act of 1994 ("F4A"), 49 U.S.C. § 14501, Articles I and VI of the United States Constitution, and the 5th and 14th Amendments of the United States Constitution.  Thus, this Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

2.     This court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 and 65.

3.     Venue in this district is appropriate pursuant to 29 U.S.C. § 1391(b), as CARB maintains its principal offices in this judicial district.  All of the events and acts and omissions of CARB giving rise to this action occurred in this judicial district.

**INTRODUCTION**

4.     Since 2020, our nation has realized the essential role that the logistics industry plays in supplying the lifeblood of our nation's economy and that this industry becomes pressured in the face of uncertainty.  Instead of providing an assurance of clear and compliant regulations, the California Air Resources Board ("CARB") has promulgated the Advanced Clean Fleets ("ACF") regulation, which expands California's regulatory authority well beyond its borders and establishes such untenable mandates that CARB itself has already been compelled to informally promise certain provisions will not be enforced.

5.     CARB's efforts are in service to the laudable goal of decreasing tailpipe emissions from commercial vehicles, but represent a vast overreach that threatens the security and predictability of the nation's goods movement industry.

6.     Understanding that goods must travel through innumerable jurisdictions, and to avoid the balkanization of emissions and regulatory standards across every one of those jurisdictions, the United States Congress has enacted two sweeping

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 2 -

preemptions of local rules that relate to the control of emissions from trucks or that relate to the price, routes, or services those trucks provide.

7.     Congress has expressly preempted state and local rules that "relate to" the control of emissions from new motor vehicles and state and local rules that "relate to" a price, route, or service of any motor carrier.  42 U.S.C. § 7543(a) ("CAA § 209"); F4A, 49 U.S.C. § 14501(c)(1).

8.     Because the ACF regulation is aimed at transforming not only the vehicles sold within California's borders, but virtually any vehicle that enters those borders, CARB has disregarded what the United States Supreme Court has declared to be "Congress's carefully calibrated regulatory scheme." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("*EMA*").

9.     Plaintiff California Trucking Association ("CTA") thus brings this suit to declare void and to permanently enjoin enforcement of the ACF regulation.

10.     ACF is comprised of four principal regulatory provisions: (1) regulations designed to phase in zero emission vehicles ("ZEVs") to fleets for state and local governments, (2) regulations designed to phase in ZEVs for "high priority fleets," (3) regulations designed to phase in ZEVs for drayage fleets, and (4) a 100 percent ZEV sales mandate effective in 2036.

11.     The CAA sets up a comprehensive federal regime through which the United States Environmental Protection Agency ("EPA") regulates emissions. Section 202(a)(1) of the CAA directs EPA to "prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines."  "Because the regulation of mobile source emissions is a federal responsibility, Congress has expressly preempted states from setting emissions standards for mobile sources...." *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 939 (9th Cir. 2011) (citing CAA § 209(a)).  According to the United States Supreme Court, "[t]he language of [the CAA] is categorical." *EMA*, 541 U.S. at 256.  EPA may, but has not, granted a

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1   waiver for CARB to adopt and enforce a regulation like ACF.

2       12.    Like the CAA, the F4A is a comprehensive law with strong preemptive

3   power. The F4A's purpose is to "'prevent States from undermining federal

4   regulation of interstate trucking' through a 'patchwork' of state regulations." *Am.*

5   *Trucking Ass'ns v. City of Los Angeles*, 660 F.3d 384, 395-96 (9th Cir. 2011), *rev'd*

6   *on other grounds*, 569 U.S. 641 (2013). The F4A's express preemption provision

7   prohibits the State of California or any subdivision thereof from making, applying, or

8   enforcing laws or regulations "related to a price, route, or service of any motor carrier

9   … or any private carrier, broker, or freight forwarder with respect to the

10   transportation of property." 49 U.S.C. § 14501(c)(1). ACF creates precisely the type

11   of patchwork the F4A was designed to avoid, as motor carriers must modify their

12   services and routes to support ZEVs both inside and outside of California. The

13   impact on the nation's logistics industry of ACF's requirements would be nothing

14   short of disastrous.

15       13.    Because ACF has the purpose and effect of interfering with interstate

16   freight operations, facilities and equipment and creates a fleet fuel program, it is both

17   expressly and impliedly preempted by the CAA, 42 U.S.C. § 7401, *et seq.,* and by the

18   F4A, 49 U.S.C. § 14501. As explained below, it also exceeds CARB's authority to

19   adopt transformative, generation-shifting rules under *W. Virginia v. EPA*, 142 S. Ct.

20   2587 (2022), and impermissibly burdens interstate commerce in violation of the

21   dormant Commerce Clause (U.S. Const., Art. I, § 8, cl. 3). Finally, ACF violates the

22   due process clauses of the 5th and 14th Amendments to the U. S. Constitution due to

23   its vague standards and the discretionary enforcement authority delegated to CARB's

24   Executive Officer under the rule.

25       **THE PARTIES**

26       14.    Plaintiff California Trucking Association is an association devoted to

27   advancing the interests of its motor carrier members who provide transportation

28   services in California. CTA promotes advocacy, safety and compliance with all

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1  applicable state and federal laws on behalf of its members, including motor carrier
2  members operating in California.

3      15.    CTA members include licensed motor carrier companies that manage,
4  coordinate, and schedule the movement of property throughout California in
5  interstate commerce.  Many of CTA's members are based in this judicial district, and
6  many other CTA members are based elsewhere but provide transportation services in
7  this judicial district.  Many of CTA's members contract with owner-operators as
8  independent contractors to provide interstate trucking services to their customers in
9  and between several states, including California.  CTA also expends significant
10  resources to ensure that its members, and the governmental agencies that regulate
11  them, understand and faithfully implement the goals and requirements of all
12  applicable laws and regulations, including ACF.  The activities of CTA's members
13  are subject to regulation under ACF, and the injuries they have suffered and will
14  suffer under ACF can only be redressed by this Court's order setting aside this illegal
15  rule and enjoining its enforcement.

16      16.    Defendant CARB is an agency of the State of California. On information
17  and belief, the current members of CARB are: Liane M. Randolph; John Eisenhut,
18  Susan Shaheen, John R. Balmes, Diane Takvorian, Cliff Rechtschaffen, Dean Florez,
19  Hector De La Torre, Davina Hurt, V. Manuel Perez, Eric Guerra, Nora Vargas, Tania
20  Pacheco-Werner, Gideon Kracov, Henry Stern, and Eduardo Garcia.

21      17.    Defendant Steven S. Cliff, sued herein in his official capacity, is
22  Executive Officer of CARB.

23      18.    Defendants CARB and Steven S. Cliff are referred to collectively
24  throughout the remainder of this Complaint as CARB.

25      19.    Plaintiff is ignorant of the true names and capacities of the defendants
26  sued herein under the fictitious names DOES 1 through 25 inclusive.  When their true
27  names and capacities are ascertained, Plaintiff will amend this Complaint to show
28  such true names and capacities.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**STATEMENT OF FACTS**

## I.    The Clean Air Act

20.    Enacted in 1970, the CAA is a comprehensive federal law which regulates air quality.  Section 202(a)(1) of the CAA directs EPA to "prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines."  EPA is also responsible for certifying that new motor vehicle engines comply with applicable standards and regulations under the CAA.  *Id.*

21.    The CAA makes "the States and the Federal Government partners in the struggle against air pollution."  *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).  The direct regulation of emissions from stationary sources is primarily left to the states (42 U.S.C. § 7416, hereinafter "CAA § 116"; *see also Engine Mfrs. Ass'n, ex rel. Certain of its Members v. United States EPA*, 88 F.3d 1075, 1079 (1996) (describing a "history of detailed state regulation of stationary sources")), while the federal government sets nationwide emissions standards for mobile sources.  The category of "mobile sources" includes both motor vehicles ("onroad") and "nonroad" sources.  *See* CAA § 202 (giving the EPA Administrator authority to set emission standards for new motor vehicles); 42 U.S.C. § 7547 ("CAA § 213") (same for nonroad sources).

22.    The CAA authorizes regulation of mobile sources through both direct emissions standards for motor vehicles and engines, and fuel composition requirements for the fuels combusted in these engines.  42 U.S.C. §§ 7521-7544 ("CAA §§ 202-210") (engine standards), §§ 7545-7549 ("CAA §§ 211-215") (fuels standards).

23.    Because the regulation of mobile source emissions is a federal responsibility, Congress has expressly preempted states from setting emissions "standards" for mobile sources.  CAA § 209(a) (preempting state regulation of new motor vehicle emissions).

24. According to the United States Supreme Court, the term "standard" broadly includes that which was "established by authority, custom, or general consent, as a model or example; criterion; test." *EMA*, 541 U.S. at 252-53 (opn. by J. Thomas striking down as preempted a rule that effectively required the purchase of lower emission vehicles).

25. Under CAA § 209(b), California can seek EPA approval for a waiver of preemption to adopt its own mobile source emissions standards, but only if the standards meet specific conditions:

    a. The standards are at least as protective of public health and welfare as federal standards,

    b. The standards are not arbitrary and capricious,

    c. The standards are needed to meet compelling and extraordinary conditions,

    d. The standards and enforcement procedures are consistent with EPA's own authority.

26. CARB is prohibited from enforcing its own emissions standards in the absence of an EPA waiver. *Pacific Merchant Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1115 (E.D. Cal. 2008) (requiring that the CAA statute which would preempt the California rule "requires California to obtain EPA authorization *prior to* enforcement.") (emphasis added).

27. The CAA specifically contemplates that states may adopt purchase mandates for fleet vehicles, but only when those mandates strictly comply with federal requirements. Section 246 (42 U.S.C. § 7586) of the CAA creates the "Clean Fuel Fleet Program" ("CFFP"), which requires that states participating in the CFFP submit their fleet regulation programs to EPA, ensuring federal oversight (*id.* at § 7586(a)); provides specific phase-in requirements (*id.* at § 7586(b)); and requires that operators be given a choice as to what type of fuel to use and what type of vehicle to buy (*id.* at § 7586(d)). The CFFP thus demonstrates Congress' carefully calibrated

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Complaint for Declaratory Judgment and Injunctive Relief

1   balance between federal and state authority over fleet vehicle emissions.

2   **II.   Mobile Source Regulation in California**

3   28.   CARB has sought many waivers to advance mobile source regulations

4   more stringent than those promulgated by EPA.  However, historically these waivers

5   have been sought for regulations that are indisputably within the scope of authority

6   Congress delegated to EPA, even if EPA had not exercised such authority itself in the

7   manner requested by CARB.  More recently, CARB has attempted to expand its

8   regulatory authority beyond EPA's, engendering litigation and creating confusion.

9   Whereas EPA is empowered by the CAA to set "standards" (*i.e.,* emissions limits) for

10   mobile sources, it is not empowered to ban fossil-fuel powered internal combustion

11   engines ("ICEs") or choose the technology which regulated entities must use in order

12   to meet such standards.

13   29.   On June 25, 2020, CARB passed the Advanced Clean Trucks rule

14   ("ACT"), codified in Cal. Code Regs., tit. 13 § 1963 *et seq.*  ACT requires medium

15   and heavy-duty vehicle manufacturers to sell ZEVs as a certain percentage of sales,

16   beginning with the 2024 vehicle model year.  ACT phases in over a period of 10

17   years, culminating in 2035 with a requirement that ZEVs comprise 55 percent of all

18   Class 2b-3, 75 percent of all Class 4-8, and 40 percent of all Class 7-8 trucks and

19   tractors sold each year.

20   30.   EPA's approval of a CAA § 209(b) waiver for ACT is currently subject

21   to litigation in the U.S. Court of Appeals for the D.C. Circuit.

22   31.   Next, in order to address emissions associated with the remaining

23   conventional medium and heavy-duty diesel trucks, CARB adopted the Heavy Duty

24   Engine and Vehicle Omnibus Regulation, often referred to as the "Low NOx

25   Omnibus."  This complex regulation requires, among other things, further reductions

26   of oxides of nitrogen ("NOx") emissions from heavy-duty on-road engines, to be

27   phased in beginning in 2024, overhauls engine testing procedures, and extends engine

28   useful life and warranty periods in order to secure durable emissions reductions.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 8 -

32.     On July 6, 2023, CARB and the Truck and Engine Manufacturers Association ("EMA") reached an agreement under which EMA and its members pledged not to litigate or oppose CARB's regulatory regime and to comply with CARB's recently adopted rules so long as CARB processed certain amendments to the Low NOx Omnibus and committed to implementation flexibility on other regulations.  As a result, the Low NOx Omnibus is currently being amended and no EPA waiver has yet been granted.

33.     Having mandated that manufacturers provide cleaner vehicles, CARB most recently has turned its attention to the "buy side," with the adoption of ACF. ACF requires that a certain percentage of vehicles acquired by fleets be ZE.  Despite the absence of a waiver from EPA, ACF purports to become effective for certain fleets in 2024 and phases in over time with the goal of a zero-emission truck and bus fleet by 2045.

34.     ACF constitutes an emission standard that requires a waiver from EPA pursuant to CAA § 209(b).  *EMA*, 541 U.S.  255.  While CARB may claim otherwise, ACF cannot be enforced until such waiver is granted.  However, ACF does not meet the requirements for such a waiver and CARB cannot request, nor can the EPA Administrator grant, a waiver for standards that are beyond the scope of EPA's own authority, such as standards that choose one technology over another.  *See*, *e.g.*, *Motor and Equipment Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 463 (D.C. Cir. 1998); *Motor and Equipment Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).

35.     ACF consists of four sub-programs:

a.   <u>State and Local Government Agency Fleet Requirements</u>.  This program applies to vehicles with a gross vehicle weight rating greater than 8,500 lbs. owned or operated by any state or local government agency in California.  Beginning in 2024, 50 percent of the vehicles purchased for such fleets must be ZEVs, increasing to 100 percent by 2027, or fleets must comply with milestone provisions mandating fleet compositions by

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 9 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    certain target years.  Cal. Code Regs., tit. 13, § 2013(d) & (e).

2       b. <u>High Priority and Federal Fleets Requirements</u>.  This program broadly

3    covers any vehicles owned by an entity with *either* 50 or more vehicles

4    in its total fleet (not merely in California) *or* $50 million in gross annual

5    revenues, and any federal government agency.  *Id.* § 2015(a)(1).  First, it

6    requires that any new ICE vehicles comply with California emissions

7    standards when they are added to the California fleet after January 1,

8    2024, regardless of whether that vehicle was sold or registered outside of

9    California.  *Id.* § 2015(r).  Adding an engine to the California fleet

10   means merely placing it into service in California more than once per

11   year.[1]  Thus, unlike CARB's other regulations, this program is not

12   limited to vehicles sold or registered in California, but applies

13   extraterritorially to any covered owner's truck that enters California.

14   Second, it requires covered fleets to do one of two things:

15       1. Retire ICE vehicles by January 1 of the calendar year after the

16          minimum useful life mileage threshold was exceeded, or January

17          1 of the calendar year the engine model year is 18 years old or

18          older, whichever occurs first."  *Id.* § 2015.1(b).  Unless a

19          convoluted exception applies, these retired trucks may *only* be

20          replaced by ZEVs.

21       2. Comply with milestone provisions mandating fleet compositions

22          by certain target years beginning in 2025.  *Id.* § 2015(d).

23   _____

24   [1] California Air Resources Board, Public Hearing to Consider the Advanced Clean
     Fleet Regulations, Final Statement of Reasons for Rulemaking, Including Summary

25   of Comments and Agency Response, at 181 (Apr. 27-28, 2023), *available at*
     https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/acf22/ac/acffsor.pdf

26   ("FSOR") ("The Regulation requires date vehicle purchase and date vehicle was
     added to the California fleet for the vehicle information reporting in the TRUCRS

27   database. Date added is effectively the date placed in service in California which is

28   typically not the same day or year the order is placed.").

c. <u>Drayage Truck Requirements.</u>  This program applies to owners and operators of on-road heavy-duty drayage trucks operating at California seaports and intermodal railyards, drayage motor carriers, and marine or seaport terminals, intermodal railyards, and railyard and seaport authorities. *Id.* § 2014(a).  Beginning in 2024, newly registered drayage trucks must be ZEVs. *Id.* § 2014.1(a)(1)(A).  The program mandates the retirement of legacy drayage trucks at the end of useful life and requires that all drayage trucks be ZEVs by 2035. *Id.* § 2014.1(a).

d. <u>2036 100 Percent Medium- and Heavy-Duty ZEVs Sales Requirement.</u>  Pursuant to this program, all medium- and heavy-duty vehicles sold in California must be ZEVs by the 2036 model year.

36.    ACF is particularly problematic for rental fleets.  By their very nature, rental fleet owners cannot control where the renter takes the vehicle.  Yet based on how ACF tries to capture transient rental fleets, for out of state rentals, each time a renter takes an out-of-state truck across the California border, it may become part of the fleet owner's "California fleet" and subject to ACF.  It is virtually impossible for the rental fleet owners to develop a compliance plan unless all trucks, whether sold and registered in Florida or Texas or Maine, comply with California's regulations.

37.    ACF is a Gordian knot, riddled with convoluted and unpredictable exceptions designed to avoid CARB's obligation to demonstrate its regulation is feasible.  For example, ACF contains exceptions from compliance for when ZEVs are unavailable.  However, these exceptions are unpredictable (*e.g.*, CARB has yet to publish a list of unavailable vehicles) and virtually impossible to qualify for (*e.g.*, fleet owner must demonstrate that its order was placed at least one year before ACF becomes effective).  As a result, covered operators are left in the dark on whether and how they will be required to comply.

38.    This has become even more apparent when considering ACF against the backdrop of existing CARB regulations.  As a direct result of the turmoil CARB has

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 11 -

introduced into the acquisition decisions of the logistics industry, EMA was compelled to request a formal advisory from CARB in which CARB agreed not to enforce its own regulation.  Specifically, EMA explained that the extra-territorial provision of ACF is "adversely affecting EMA's members' ability to provide fleets with vehicles powered by internal combustion engines," "impacting the ability of those out-of-state fleets that have operations in California to effectively place orders and conduct business operations," "undermin[ing] the flexibilities built into the proposed changes to the … Omnibus regulation," and as a result, is "holding up fleet orders since both original equipment manufacturers (OEMs) and fleets want to know they are compliant in California when they sell and buy the engines that may travel into the state."  In response, CARB "determined that initiating enforcement actions against an out-of-state fleet, or selling OEMs, based on noncompliance with [ACF] for model years 2024 and 2025 *may not be warranted* based on the specific and fluctuating circumstances of engine sales."  But this exercise of discretion could be retracted as easily as it was given.

39.     Congress has long understood the need for certainty and consistency in establishing emissions standards for vehicles supplying the lifeblood of the economy. On this point, Congress has spoken clearly and categorically preempted state and local emissions standards unless the particular requirements for a California waiver have been met.  Even where those standards are met, nothing in the CAA can be plainly read to have authorized the transformative shift from fossil fuel-powered vehicles to ZEVs mandated by ACF.  Steaming ahead with ACF in the absence of a waiver and in absence of clear Congressional authority has thus "undo[ne] Congress's carefully calibrated regulatory scheme." *EMA*, 541 U.S. at 255.

## III.     Federal Regulation of the Trucking Industry

40.     Just as Congress has recognized the importance of uniform, predictable regulations for new engine emissions standards, it has long prioritized clear regulation of motor carriers.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

41.     Prior to 1980, both federal and state governments regulated the trucking industry, creating a patchwork of regulations depending on the location of a particular truck at a particular time and dictating, both directly and indirectly, how transportation services could be provided and the prices that could be charged for those services.

42.     In 1980, Congress passed the first salvo of a strong federal policy favoring a trucking industry shaped primarily by competitive market forces against a backdrop of uniform federal regulation.  The Motor Carrier Act deregulated interstate trucking so that the rates and services offered by licensed motor carriers and related entities would be set by the market rather than by government regulation.  49 U.S.C. § 11503a.

43.     Concluding that state regulation of the trucking industry "causes significant inefficiencies," "increase[s] costs, and "inhibit[s] . . . innovation and technology," Congress enacted the F4A's preemption provision to ensure that "national and regional [motor] carriers attempting to conduct a standard way of doing business" would not be hindered by "[t]he sheer diversity of [state] regulatory schemes." H.R. Conf. Rep. No, 103-677 at 87.  This provision provides:

> [A] State… may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier* (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.  49 U.S.C. § 14501(c)(1) (italics added).

44.     In enacting the F4A, Congress' "overarching goal" was "helping ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (internal quotations omitted).  The F4A's express preemption provision furthers this purpose by "'prevent[ing] States from undermining federal regulation of

- 13 -

interstate trucking' through a 'patchwork' of state regulations." *Am. Trucking Ass'ns*, 660 F.3d at 395-96, *rev'd on other grounds*, 569 U.S. 641 (2013).

45.     The United States Supreme Court has explained that the "ban on enacting or enforcing any law 'relating to rates, routes, or services' is most sensibly read … to mean States may not seek to impose their own public policies or theories of competition or regulation on the operations of [a motor] carrier." *Am. Airlines, Inc. v. Wolens,* 513 U.S. 219, 229 n.5 (1995) ("*Wolens*") (applying equivalent preemption provision of the Airline Deregulation Act and observing that Congress's "overarching deregulatory purpose" means that "States may not seek to impose their own public policies . . . on the operation of a . . . carrier") (internal quotation marks omitted). "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on the needs perceived by the contracting parties at the time." *Id.* at 230.

46.     The adoption of ACF represents a direct regulation of the trucking industry with acute impacts on prices, routes, and services in direct conflict with Congressional policy. It mandates that fleet owners retire certain vehicles and acquire only vehicles of a particular kind—ZE. The adoption of ZEVs under ACF will have dramatic impacts on the prices, routes, and services that covered motor carriers can provide. For example:

   a. The capital costs of ZE tractors are projected to be 2 to 6 times higher than comparable ICE tractors. Further, the total cost of ownership may be significantly higher. These costs represent nearly 50 percent of motor carriers' marginal costs and cannot simply be absorbed—they will inevitably impact prices.

   b. The capabilities of ZEVs are also dramatically different. The average range of a ZEV is less than half that of an ICE truck. Additionally, the ubiquity of diesel refueling facilities means that motor carriers can currently run any legally-available route with their choice solely dictated

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 14 -

by efficiency and market considerations.  Motor carriers compelled to operate ZEVs will be directly restricted to the subset of legally available routes that have sufficient recharging/refueling facilities at sufficient densities.  Additionally, the location of existing terminals for motor carriers are based on the range achievable through use of conventional fuels.  The forced conversion to ZEVs will dramatically reduce the achievable range and thus compel the relocation of terminals.  This will have a significant impact on motor carriers' choice of routes.

c. Services will also be dramatically impacted.  Federal law regulates the amount of time in a given day and week that a commercial driver can work. *See* 49 C.F.R. §§ 395.3(a)(2), § 395.3(b).  Refueling is typically an on-duty activity consuming available duty hours.  Given the increased duration and frequency of recharging/refueling for ZEVs, ACF will require that drivers spend a significantly smaller portion of their duty time moving freight.

47. Each of these direct, significant impacts on prices, routes and services standing alone would be sufficient to render ACF preempted under F4A.  CARB's attempts to mitigate emissions directly interferes with Congressional policy.

48. ACF also looks to wreak havoc on the nation's logistics industry.  The mega port comprised of the ports of Long Beach and Los Angeles processes 40 percent of the nation's containerized imports and combined the ports are the ninth biggest port in the world.  The Port of Los Angeles provides 1 in 9 jobs in Southern California and nearly 3 million jobs nationwide, and processes $311 billion worth of cargo per year.

49. ACF's impact is not limited to California.  In addition to the ripple effects of any California regulation on the economy, ACF applies by its express terms to trucks outside of California.  By merely making one trip into California, a truck becomes part of the "California fleet" of a covered owner and is subject to ACF even

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Complaint for Declaratory Judgment and Injunctive Relief

if that truck was sold and registered in another state.  ACF's extraterritorial effect will burden interstate commerce and impact both national and international trade, leading to the potential loss of jobs due to the transfer of goods to other U.S. ports, a marked increase in the cost of moving freight and goods nationally and internationally, and potential supply chain disruptions.

## COUNT I

**(Declaratory/Injunctive Relief — Preemption by the Clean Air Act [CAA § 209])**

50.     CTA realleges and incorporates all of the foregoing paragraphs.

51.     Through the formation of EPA in 1970, and the passage of major amendments to the CAA in 1970, 1977, and 1990, Congress provided EPA with the responsibility for establishing national emissions standards and other requirements for mobile sources of air pollution.

52.     Section 209(a) of the CAA provides in pertinent part:
"Prohibition. No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."

53.     ACF is a "standard relating to the control of emissions from new motor vehicles." As the Supreme Court explained, "[a] command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles." *EMA*, 541 U.S. at 255.

54.     The CAA authorizes EPA to grant California a waiver of CAA preemption only under certain circumstances for vehicle emission standards consistent with the CAA.

55.     CARB itself has acknowledged that a waiver is required to implement

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 16 -

ACF.[2]

56.     CARB cannot enforce ACF until it has obtained a waiver but nevertheless purports to begin implementing ACF on January 1, 2024.

57.     EPA cannot grant a waiver in any event because ACF does not meet the requirements for such a waiver under CAA § 202(a).  Among other challenges, CARB has not and cannot demonstrate that ACF, in conjunction with California's suite of other emissions standards, including ACT and Low-NOx Omnibus, is technologically feasible.

58.     Moreover, CARB's implementation of ACF and EPA's grant of a waiver are barred by the major questions doctrine as CARB is "claim[ing] the power to resolve a matter of great 'political significance'".  *W. Virginia,* 142 S. Ct. at 2620 (Gorsuch, J., concurring) (internal quotation marks omitted).  Like the regulation at issue in *W. Virginia,* the ACF regulation would regulate "a significant portion of the American economy", including in states other than California, and "require 'billions of dollars in spending' by private persons or entities." *Id.* at 2621 (Gorsuch, J., concurring) (internal quotation marks omitted).

59.     In *W. Virginia*, the Supreme Court explained that EPA could not use vague provisions of a statute to work a transformative transition away from fossil fuels. *Id.* at 2616.  As in the energy sector at issue in *W. Virginia*, Congress has not clearly authorized such a transition for motor vehicles and "[a] decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from the representative body." *Id.*

60.     Nor is this conclusion lessened by the state-level nature of ACF as it is

---

[2] California Air Resources Board, Public Hearing to Consider the Advanced Clean Fleet Regulations, Final Statement of Reasons for Rulemaking, Including Summary of Comments and Agency Response, Appendix A, Legal Comments and Responses at 41 (Apr. 27-28, 2023) ("CARB agrees that it needs a preemption waiver to enforce the elements of the ACF regulation that establish standards for new motor vehicles and new motor vehicle engines."), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/acf22/ac/acffsorappa.pdf.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1   not merely effective within California's borders.  In addition to any state that adopts

2   California's standards pursuant to CAA § 177, ACF applies extraterritorially to any

3   vehicle that may enter California.  Any California standard for new motor vehicles is

4   preempted unless a waiver can be granted, and EPA has no authority to grant a

5   waiver that would "direct existing sources to effectively cease to exist." *Id.* at 2612,

6   n.3.  As EPA may not grant a waiver to control emissions beyond its own statutory

7   authority, California may not adopt motor vehicle standards beyond the scope of

8   EPA's own authority because EPA cannot waive such standards.

9        61.     Congress has considered, but not yet acted on, ZEV mandates and ICE

10  bans, nor has EPA.  The policy implications of ACF are also far beyond what the

11  California Legislature has directed.  In fact, the Legislature has failed to pass

12  proposed legislation banning ICE vehicles. *See, e.g.,* Assembly Bill 1745, 2017–18

13  Reg. Sess. (Cal. 2018) (would have prohibited the original registration of non-ZEV

14  vehicles starting in 2040).  In addition, the Legislature has passed bills requiring at

15  least 15 percent of newly purchased passenger vehicles and light-duty trucks in the

16  State to be ZEVs beginning in 2025 and at least 30 percent beginning in 2030,

17  demonstrating that it knows how to authorize CARB to impose vehicles mandates if

18  it wants to.  Assembly Bill 739, 2017–18 Reg. Sess. (Cal. 2017).

19       62.     In no form has the Legislature granted to CARB, or Congress granted to

20  EPA, the authority to adopt a regulation with such sweeping power over the

21  California economy, and by virtue of the interstate nature of California's trucking

22  industry, the national economy.

23       63.     The United States Constitution makes federal law and regulations "the

24  supreme Law of the Land." U.S. Const., art. VI, cl. 2.  CTA and its members have

25  legally protected interests under the Constitution, the CAA, and other federal laws in

26  the full enforcement of the federal laws against CARB's implementation of ACF.

27  CTA and its members will be actually and irreparably injured with respect to their

28  federally protected interests if ACF is not declared unlawful and its implementation is

1    not enjoined.

2        64.    A clear and judicially cognizable controversy exists between CTA and

3    its members, on the one hand, and CARB, on the other, over whether ACF is

4    preempted by the CAA.  CTA and its members contend that the regulation is

5    preempted by the CAA and cannot be enforced.  CARB has rejected CTA's and other

6    interested parties' arguments to this effect.

7        65.    To redress the violations of federal law and the interference with such

8    rights, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and other provisions of law,

9    including the Supremacy Clause, CTA requests a declaration that ACF is preempted

10    and unenforceable.

11        66.    CARB is now implementing and will continue to implement ACF in

12    violation of federal law unless enjoined by this Court from doing so.  CTA is

13    therefore also entitled to injunctive relief restraining and redressing these violations

14    of federal law, and the Supremacy Clause, and other provisions of law.

15    **COUNT II**

16    **(Declaratory/Injunctive Relief — Preemption by the Clean Air Act [CAA § 246])**

17        67.    CTA realleges and incorporates all the foregoing paragraphs.

18        68.    Section 246 of the CAA (42 U.S.C. § 7586) created the CFFP, which

19    covers vehicle acquisition decisions by individuals, corporations, and all levels of

20    state government.  The purchase requirements in Section 246 apply to "covered

21    fleets," which are broadly defined to mean "10 or more motor vehicles which are

22    owned or operated by a single person." 42 U.S.C. § 7581(5).  A program enacted

23    through Section 246 would require a specified percentage of all new covered fleet

24    vehicles to be clean-fuel vehicles, meeting the CAA's mandated emissions standards.

25    *Id.* at § 7586.

26        69.    The Supreme Court in *EMA* explained that the CAA's CFFP prescribes

27    "numerous detailed requirements" that must be complied with to avoid preemption.

28    541 U.S. at 254 n.6, 257-58.  Among other things, Section 246 requires that States

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

participating in the CFFP submit their fleet regulation programs to EPA as revisions to the State Implementation Plan,[3] to ensure federal review and oversight.  42 U.S.C. 7586(a).  Section 246(b) additionally sets out specific phase-in requirements.  42 U.S.C. 7586(b).  Most importantly, section 246(d) requires States to give fleet operators the choice of what type of fuel to use and what type of vehicle to buy, so long as other congressionally specified requirements are met.  42 U.S.C. 7586(d).

70.     As the Supreme Court explained, "The fleet purchase standards [Section 246] mandates must comply strictly with federal specifications, being neither more lenient nor more demanding.  But *what is the use of imposing such a limitation if the States are entirely free to impose their own fleet purchase standards with entirely different specifications?*"  *EMA*, 541 U.S. at 258 (emphasis added).

71.     Following the decision in *EMA*, the Ninth Circuit noted that, while a purchase mandate applicable to government fleets was not preempted, section 246 could preclude a purchase mandate applicable to private fleet operators.  *Engine Mfrs. Ass'n v. S. Coast Air Quality Management Dist.*, 498 F.3d 1031, 1044 (9th Cir. 2007).

72.     Yet that is precisely what CARB has attempted to do.  ACF establishes a purchase mandate for fleet vehicles inconsistent with the provisions of section 246. California cannot circumvent the care with which Congress calibrated the CAA's provisions balancing federal and state authority over fleet vehicle emissions by attempting to adopt its own purchase standard separate and apart from CFFP.  Section 246 and its associated provisions demonstrate that Congress intended that states regulate new fleet vehicle purchases only in accordance with EPA's oversight and the CAA's design.  "Congress's prescription of numerous detailed requirements for such programs [is] inconsistent with unconstrained state authority to enact programs that ignore those requirements."  *EMA*, 541 U.S. at 254 n.6.

---

[3] A State Implementation Plan or "SIP" is a plan that explains how each state intends to comply with the national ambient air quality standards in the CAA.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

73.   The United States Constitution makes federal law and regulations "the supreme Law of the Land." U.S. Const., art. VI, cl. 2.  CTA and its members have legally protected interests under the Constitution, the CAA, and other federal laws in the full enforcement of the federal laws against CARB's implementation of ACF. CTA and its members will be actually and irreparably injured with respect to their federally protected interests if ACF is not declared unlawful and its implementation is not enjoined.

74.   A clear and judicially cognizable controversy exists between CTA and its members, on the one hand, and CARB, on the other, over whether ACF is preempted by the CAA.  CTA and its members contend that the regulation is preempted by the CAA and cannot be enforced.  CARB has rejected CTA's and other interested parties' arguments to this effect.

75.   To redress the violations of federal law and the interference with such rights, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and other provisions of law, including the Supremacy Clause, CTA requests a declaration that ACF is preempted and unenforceable.

76.   CARB is now implementing and will continue to implement ACF in violation of federal law unless enjoined by this Court from doing so.  CTA is therefore also entitled to injunctive relief restraining and redressing these violations of federal law, and the Supremacy Clause, and other provisions of law.

### COUNT III

**(Declaratory/Injunctive Relief — Preemption by the F4A [49 U.S.C. § 14501])**

77.   CTA realleges and incorporates all the foregoing paragraphs.

78.   The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of the F4A, prohibit the State of California from making, applying, or enforcing laws "related to a price, route, or service of any motor carrier … or any private carrier, broker, or freight forwarder with respect to the

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 21 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    transportation of property." 49 U.S.C. § 14501(c)(1).

2        79.    At all relevant times, CTA and its members, and all others similarly

3    situated, had, have, and will have the right under the Supremacy Clause not to be

4    subjected to or punished under state laws that interfere with, are contrary to, or are

5    otherwise preempted by federal law.

6        80.    An actual controversy exists among the parties because motor carriers,

7    the primary constituency that CTA represents, will be required to change their prices,

8    routes, and services in order to comply with ACF and will be required to offer

9    services (use of ZEVs) which the market does not compel.  Thus, motor carriers

10   cannot freely contract for the provisions of freight services because ACF compels

11   changes to prices, routes, and services.

12       81.    The application of ACF directly impacts the services, routes and prices

13   that CTA's members and other similarly situated motor carriers, operators, freight

14   forwarders, and/or brokers offer their customers for the transportation of goods in

15   local and interstate commerce.  Before ACF's adoption, motor carriers were free to

16   contract with an extensive network of independent contractors to provide virtually

17   any type and number of trucks, trailers, drivers, and equipment needed for a

18   particular job on little or no notice.  Following ACF's adoption, covered fleet owners

19   may not bring non-compliant trucks into California.

20       82.    ACF also impacts routes, services, and pricing by imposing

21   requirements on motor carriers, in contravention of the United States Supreme

22   Court's determination that regulations cannot require carriers to offer prices, routes,

23   and services that differ significantly from those that the market would dictate in the

24   absence of regulation.  *Rowe,* 552 U.S. at 374.

25       83.    As described above, ACF will restrict and modify the routes available to

26   motor carriers in California and nationally in order to accommodate the mandated

27   ZEV conversion.  Once ZEVs are acquired, motor carriers, operators, freight

28   forwarders, brokers and their contractors must modify their routes and services, not

- 22 -

1  only in California but nationally, based on charging infrastructure availability.

2      84.    Prices will also be compelled to increase to absorb the costs of ZEVs

3  and their infrastructure.  At present, ZE freight vehicles remain in the

4  experimental/demonstration phase, are not commercially available through all

5  classes, and represent a significant acquisition cost increase above conventional

6  vehicles.  A motor carrier/operator that chooses to invest in these specialized trucks

7  will have to charge its customers higher prices than before for those specialized

8  services.

9      85.    Additionally, while some motor carrier contractors have begun to

10  request ZEVs, these contractors are the exception, not the rule.  There is nothing to

11  suggest that the market currently dictates that motor carriers provide ZEVs as part of

12  their services.  Services will also be compelled to change in light of the reduced

13  worker hours to accommodate increased recharging/refueling times resulting from

14  ACF.

15      86.    ACF compels operators to change their business in ways that will

16  directly impact the types of services the motor carriers provide to their customers, the

17  routes the drivers must take, and the prices that the motor carriers charge their

18  customers for services.  Unless Defendants are restrained and enjoined from

19  enforcing ACF, CTA members and other similarly situated motor carriers will suffer

20  irreparable harm.

21      87.    CTA has no plain, speedy, and adequate remedy at law, making

22  injunctive relief necessary.

23  **COUNT IV**

24  **(Declaratory/Injunctive Relief – Violation of Due Process [U. S. Const. amend. V**

25  **& amend. XIV])**

26      88.    CTA realleges and incorporates all of the foregoing paragraphs.

27      89.    The Constitution prohibits the deprivation of "life, liberty, or property,

28  by the federal and state governments without due process of law.  U.S. Const. amend.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 23 -

1    V, amend. XIV.

2        90.    "It is a basic principle of due process that [a law or regulation] is void

3    for vagueness if its prohibitions are not clearly defined." *Grayned v. City of*

4    *Rockford*, 408 U.S. 104, 108 (1972).

5        91.    In order not to be void for vagueness, a law must provide fair warning

6    and give a "person of ordinary intelligence a reasonable opportunity to know what is

7    prohibited, so that he may act accordingly," and "provide explicit standards" to the

8    parties who apply laws so as to avoid "arbitrary and discriminatory application." *Id.*

9    at 108-109. A law is unconstitutionally vague if it "impermissibly delegates basic

10   policy matters...for resolution on an *ad hoc* and subjective basis." *Id.*

11       92.    As described above, ACF presents no clear regulatory scheme that can

12   be understood by regulated parties, nor even by CARB itself. The voluminous record

13   during ACF rulemaking demonstrates the clear confusion regulated parties have in

14   understanding their obligations under the rule.[4]

15       93.    Beyond the numerous questions in rulemaking documents, CARB has

16   also produced multiple question and answer documents on their website and

17   regulated parties have submitted numerous questions to CARB's

18   zevfleet@arb.ca.gov email, often receiving answers admitting to gray areas in the

19   regulation, that processes for submitting for exemptions are not yet determined, and

20   that documents needed to determine various exemption's applicability are not yet

21   available. These responses to questions show confusion on both the part of regulated

22   ───────────────────

23   [4] *See, e.g.,* FSOR at 268 ("it is unclear if this or other atypical uses meets the
     definition of a vehicle operated in the state"), 285 ("unclear bar to be eligible for the

24   Daily Usage Exemption" and questioning how it would be assessed), 308
     (infrastructure delay exemption is unclear), 326 ("many of the truck types considered

25   in [ACF] are undefined, making it unclear if a particular type of ground support
     equipment falls within the list"); CARB, Addendum to the Final Statement of

26   Reasons for Rulemaking, Advanced Clean Fleets Regulation at 22 (Aug. 30, 2023),

27   *available at*
     https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/acf22/ac/acffsoradd1.pdf

28   ("definition of 'vehicle purchase' is unclear on its face as to lease buyouts").

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

parties, and CARB itself, as to how ACF applies in numerous scenarios.

94.     ACF as adopted has also unlawfully delegated to CARB and its Executive Officer the authority to arbitrarily and discriminatorily enforce the rule on an *ad hoc* and subjective basis.

95.     This is demonstrated by the numerous exemptions and extensions from compliance, including for general purposes, daily usage, infrastructure delays, mutual aid and emergency events, vehicle delivery delays, waste and wastewater, and ZEVs purchase included in ACF.  Cal. Code Regs., tit. 13, § 2015.3.  These provisions provide that fleet owners may request exemptions from compliance from CARB, which CARB will review and the Executive Officer will grant if fleet owners are determined to have qualified.  However, the exemptions contain language so unclear as to render the entire regulation unimplementable.  *See id.* at (c)(1) ("construction delay due to circumstances beyond their control"); (c)(2) (same); (c)(2)(B) (infrastructure site electrification delay stating fleet owner must deploy maximum number of ZEVs needed to meet its compliance obligations and that can be supported by utility without explanation of how CARB will determine how many ZEVs "can be supported"); (d) (ZEVs cannot be delivered due to "circumstances beyond the fleet owner's control").

96.     In many of the exemptions, the Executive Office is given authority to subjectively determine whether the qualifications for granting an exemption have been met.  *Id.* at (c)(1)(E) (Executive Officer will "utilize their good engineering judgment to determine whether" exemption is granted); (c)(2) (same); (e)(2) (Executive Office will rely on "good engineering and business judgment" to determine if information qualifies fleet for exemption); (e)(2)(C) (same).  This subjective and *ad hoc* determination of a regulation's applicability flies in the face of the vagueness doctrine.

97.     The ZEV purchase exemption in Cal. Code Regs., tit. 13, § 2015.3(e) is particularly opaque.  CARB purports that it will create and maintain a list of vehicle

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

configurations on its website that are not available for purchase as ZEVs and thus for which a regulated entity can obtain an exemption from ACF.  However, no such completed list is yet available.  Nor does ACF specify how CARB should create the list or what process will be used to create it.

98.    In addition, ACF does not require CARB to post such a list until January 1, 2025.  It is unclear how regulated entities are able to know whether they can apply for an exemption under this section, or whether they must fully comply with ACF's requirements, when no such list is currently available and fleet purchases are made well in advance of compliance year obligations, yet ACF requires regulated entities using the Model Year Schedule compliance pathway to purchase only ZEVs beginning January 1, 2024.  Cal. Code Regs., tit. 13, § 2015(d).

99.    Commenters requested appeal processes for the denial of the various exemptions,[5] but CARB repeatedly denied this request. Thus, not only does CARB have subjective discretion to apply the exemptions on an *ad hoc* basis, but regulated entities have no recourse if exemptions are improperly denied.

100.   Because ACF allows the Executive Officer to use his discretion to arrive at a determination of whether to grant or deny the listed exemptions, and because CARB and the regulated parties recognize that ACF's exemptions are necessary in order to make the rule enforceable and feasible, the rule is unconstitutionally vague. *Cook Family Foods, Ltd. v. Voss*, 781 F.Supp 1458 (C.D. Cal. 1991) (giving field inspectors discretion to determine standards used in determining compliance rendered law unconstitutionally vague).

### COUNT V

**(Declaratory/Injunctive Relief – Violation of the Dormant Commerce Clause [U. S. Const., Art. I, § 8, cl. 3])**

101.   CTA realleges and incorporates all of the foregoing paragraphs.

102.   The Constitution vests Congress with the power to "regulate Commerce

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

---

[5] FSOR at 190.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    ... among the several States" and preempt contrary state laws.  U. S. Const., Art. I, §

2    8, cl. 3; *see also* Art. IV, § 2.  The Commerce Clause also "contain[s] a further,

3    negative command," one effectively forbidding the enforcement of "certain state

4    [regulations] even when Congress has failed to legislate on the subject." *Oklahoma*

5    *Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

6    103.   This dormant Commerce Clause prevents states from enforcing state

7    laws that burden interstate commerce, even if no discriminatory purpose is present,

8    when "the burden imposed on [interstate] commerce is clearly excessive in relation to

9    the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

10   Thus, "even nondiscriminatory burdens on commerce may be struck down on a

11   showing that those burdens clearly outweigh the benefits of a state or local practice."

12   *Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 353 (2008).

13   104.   The Supreme Court has stated that "[s]tate regulations on

14   instrumentalities of interstate transportation—trucks, trains, and the like" (*Nat'l Pork*

15   *Producers Council v. Ross*, 598 U.S. 356, 379 n.2 (2023)) fall within "*Pike*'s

16   heartland" (*id.* at 389 n.4).  Where "'a lack of national uniformity would impede the

17   flow of interstate goods,'" the Commerce Clause preempts the regulation.  *Id.* at 379

18   n.2 (quoting *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 128 (1978)); *see*

19   *also General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997) (even state laws

20   which do not impose disparate treatment on similarly situated in-state and out-of-

21   state interests are disallowed where such laws undermine a compelling need for

22   national uniformity in regulation).

23   105.   In adopting ACF and regulating trucks and other vehicles of interstate

24   transport, CARB has regulated within *Pike's* heartland and thus violated the dormant

25   Commerce Clause by burdening instrumentalities of interstate transport and the

26   channels of interstate commerce.

27   106.   As explained above, Congress has determined under both the Clean Air

28   Act and F4A that the need for national uniformity in emissions standards and

- 27 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

standards governing trucking activities is paramount and tolerates only circumscribed exceptions. Congress declared in F4A that state regulation of the trucking industry "imposed an unreasonable burden on interstate commerce" that "impeded the free flow of trade, traffic, and transportation of interstate commerce." Pub. L. No. 103-305, § 601(a)(1)(A)-(B), 108 Stat. 1569, 1605 (1994). Any balkanization of such standards would therefore, as recognized by Congress and the courts, impermissibly burden our national logistics network.

107.    The ACF regulation will directly impact hundreds of thousands of trucks operating in interstate commerce on a daily basis. ACF contemplates the turnover of 518,000 trucks by 2040,[6] but CARB fails to even discuss the number of out-of-state trucks that will also be impacted by the regulation. CARB also predicts ACF will increase the number of medium- and heavy-duty ZEVs operating in California by nearly 400 percent between 2023 and 2050, clearly affecting operations of instrumentalities in interstate commerce.[7] The cost of ZEVs is also higher than combustion-powered trucks and would require massive infrastructure investments.[8]

108.    In addition, ACF may exclude many out-of-state motor carriers, freight forwarders and/or brokers from the California market by preventing them from even bringing their trucks into California. *See* Cal. Code Regs., tit. 13, § 2015.2 ("[i]f a vehicle is operated in California at any time during a calendar year, it will be considered part of the California fleet for the entire calendar year"). This extraterritorial rulemaking presents a significant burden on out-of-state operators, who are required to fully comply with ACF, even if only minimal mileage occurs in

[6] California Air Resources Board, Public Hearing to Consider the Proposed Advanced Clean Fleets Regulation, Staff Report: Initial Statement of Reasons at 59 (Aug. 30, 2022), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/acf22/isor2.pdf ("ISOR").

[7] *Id.* at 1.

[8] *See id.* at 90-91.

the state.[9]

109.   Implementation of ACF will also cause motor carriers, freight forwarders and/or brokers to modify their routes and services, and impede the free flow of commerce into and out of California, a state home to the mega port of Los Angeles and Long Beach.

110.   The burdens imposed on the trucking industry under ACF will lead to significant impacts on international and national trade, including the potential loss of jobs due to the transfer of goods to other U.S. ports, a marked increase in the cost of moving freight and goods nationally and internationally, and potential supply chain disruptions.  Courts have previously recognized that there is an inherent "difficulty [in] subjecting motor vehicles, which readily move across state boundaries, to control by individual states." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996).

111.   ACF will cause the premature retirement of many ICE vehicles (Cal. Code Regs. tit. 13, § 2015.1(b)), altering the existing trucking fleet and leading to the acceleration of truck turnover and potentially significant financial implications for the trucking industry.  Fleet owners and operators will have to invest significant amounts in both the infrastructure necessary to comply with ACF and the ZEVs themselves. ACF will thus lead to higher costs to transport goods both within California and in interstate commerce, and will likely lead to delays and inefficiencies in the logistics network.  This could also lead to increased costs to consumers across the country.

112.   CARB has not demonstrated that the local benefits of the rule outweigh the enormous burdens on interstate commerce ACF will engender.  Though ACF will reduce emissions of NOx, impacting local communities, CARB also clearly states

_____

[9] Though ACF allows a so-called "5-Day Pass", allowing trucks to operate in California for five days per year without becoming part of the California fleet, this exemption is very limited and strictly applied, disallowing non-consecutive days of entry such that even entry into the state for two non-consecutive days would not allow a truck to qualify.  FSOR at 282.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 29 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

that "ZEVs are needed to reduce emissions of criteria pollutants *and greenhouse gases*."[10]  As climate change is a global concern, reducing greenhouse gas emissions provides no local benefit.  In addition, ACF will do little to address climate change when it addresses only a small percentage (new trucks) of the 6 percent of global carbon dioxide emissions that come from motor vehicles in the U.S.

113.   Further, the numerous exemptions to ACF described above undermine any analysis or calculation of emissions reductions likely to be achieved by the rule. This is especially true when ACF is considered in conjunction with ACT and Low NOx Omnibus, regulations which already require trucking fleets to become less-emitting over time and which will achieve many of the emissions reductions that CARB alleges it will achieve through ACF, even if ACF were not in place.

114.   For these reasons, ACF imposes substantial burdens on the market for interstate transport of goods and thereby impedes the flow of interstate commerce far in excess of any purported, or likely to be achieved, local benefits.

115.   CTA has no plain, speedy, and adequate remedy at law, making injunctive relief necessary.

## COUNT VI

### (Declaratory Relief)

116.   CTA realleges and incorporates the foregoing paragraphs.

117.   This case presents a justiciable issue in that fleet operators operating in California must already comply with ACF or face significant penalties.

118.   A declaratory judgment in this matter would terminate and afford relief from the uncertainty, cost, disruption, conflict, and controversy giving rise to this proceeding and prevent a similar situation from arising in the future.

119.   This matter is most properly resolved through a declaratory judgment issued by this Court.  The matter involves important federal law questions, and a ruling in this case will have significant impact on the national system of freight

---

[10] ISOR at 100 (emphasis added).

1  transportation.  It is, therefore, of critical importance to the trucking industry and the
2  public at large.

3  **COUNT VI**

4  **(Preliminary and Permanent Injunctive Relief)**

5      120.   CTA realleges and incorporates the foregoing paragraphs.

6      121.   CTA and its members will suffer irreparable harm if CARB's
7  implementation and enforcement of ACF is not enjoined.  The impact of ACF on the
8  efficiency of the nation's logistics system is significant, and the economic loss
9  attributable to delays, equipment shortages, and interference with dispatching and the
10  efficient allocation of freight vehicles is not capable of clear calculation.  The threat
11  of facing substantial, and perpetually on-going economic sanctions for non-
12  compliance also threatens to cause CTA's members and other local and interstate
13  commercial transportation and logistics operators doing business in California—
14  together with their customers and the public-at-large—irreparable harm.

15      122.   CTA and its members have no adequate remedy at law for the injuries
16  alleged herein.  Even if the monetary value of the perpetually on-going injuries to
17  CTA and its members could be ascertained, there is no action at law available to CTA
18  and its members to recover such losses from CARB.  Only this Court's exercise of its
19  equitable powers can protect CTA, its members, and other similarly situated
20  operators from the threatened irreparable harm.

21      123.   Whereas injunctive relief would prevent irreparable injury to CTA, its
22  members, other similarly situated operators, and the public-at-large, on balance, the
23  injury to CARB, if any, would only amount to a judicial declaration of the prescribed
24  constitutional and statutory limits on its authority.

25  **PRAYER FOR RELIEF**

26  WHEREFORE, Plaintiffs CTA and its members pray:

27      A. For a declaration that (1) ACF is invalid and (2) it is contrary to law for
28  Defendants to enforce ACF;

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Complaint for Declaratory Judgment and Injunctive Relief

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    B. For a preliminary and permanent injunction requiring Defendants to

2    conform their conduct to such judicial declaration and barring them from

3    implementing or enforcing in any way ACF;

4    C. For such costs and attorneys' fees to which Plaintiffs may be entitled by

5    law; and

6    D. For such other, further or different relief as this Court may deem just and

7    proper.

8

9

10   Dated:        October 16, 2023          HOLLAND & KNIGHT LLP

11                                           By: *Marne Sussman*

12                                              Marne S. Sussman

13                                           Attorneys for Plaintiff CALIFORNIA
14                                           TRUCKING ASSOCIATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory Judgment and Injunctive Relief