HOLLAND & KNIGHT LLP
Marne S. Sussman, Esq. (SBN 273712)
*marne.sussman@hklaw.com*
Brian C. Bunger, Esq. (SBN 142001)
*brian.bunger@hklaw.com*
Emily M. Lieban, Esq. (SBN 303079)
*emily.lieban@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: 415.743.6900
Fax: 415.743.6910

Attorneys for Plaintiff CALIFORNIA
TRUCKING ASSOCIATION

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN S. CLIFF, in his official capacity, and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 2:23-cv-2333-TLN-CKD<br><br>**CALIFORNIA TRUCKING ASSOCIATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: April 17, 2025<br>Time: 2:00 p.m.<br>Courtroom: 2, 15th Floor<br>Judge: Hon. Troy L. Nunley<br>Trial Date: None Set<br>Action Filed: October 16, 2023 |

Holland & Knight LLP<br>560 Mission Street, Suite 1900<br>San Francisco, CA 94105<br>Tel: 415.743.6900<br>Fax: 415.743.6910

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 17, 2025 at 2:00 p.m., or as soon thereafter as the matter may be heard before the Honorable Troy L. Nunley in Courtroom 2 of the United States District Court for the Eastern District of California, located at Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, CA 95814, Plaintiff California Trucking Association ("CTA") will and hereby does move this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure as to the Third Cause of Action set forth in CTA's Complaint for Declaratory Judgment and Injunctive Relief (the "Complaint") (Dkt. No. 1), on the issues identified below.

The grounds for this Motion are that there are no triable issues of material fact and that CTA is entitled to judgment as a matter of law as to its Third Cause of Action, because the Advanced Clean Fleets regulation adopted by the California Air Resources Board will impermissibly impact the prices, routes, and services offered by motor carriers in violation of the Federal Aviation Administration Authorization Act and is therefore preempted by federal law.

This Motion is based upon this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Statement of Undisputed Facts filed concurrently herewith, the Declarations of Marne Sussman, Chris Shimoda, Peter Schneider, Michael Pugh, Sanford Hodes, and Karen Vellutini filed concurrently herewith, the documents attached to those Declarations, and pleadings on file in this case, and such further evidence as may be presented at the hearing of the motion.

Dated: November 4, 2024                 HOLLAND & KNIGHT LLP

*Marne S. Sussman*
Marne S. Sussman

Attorneys for Plaintiff CALIFORNIA TRUCKING ASSOCIATION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ...................................................................................................1

    A.    Advanced Clean Fleets. ..............................................................................1

    B.    California Trucking Association. ................................................................2

III.  STANDARD OF REVIEW ...................................................................................3

IV.   STATE OF THE LAW .........................................................................................3

V.    LEGAL ARGUMENT ..........................................................................................6

    A.    ACF interferes with Congress's deregulatory and preemptive objectives..............6

    B.    ACF impermissibly impacts rates, routes, and services. ...........................9

        1.    As ACF is an industry-specific regulation, ACF's impacts are "significant." ..............................9

        2.    CARB's acknowledged ACF cost impacts. ...................................10

        3.    ACF's actual impacts on motor carrier costs. ...............................13

        4.    ACF's route impacts. .....................................................................15

        5.    ACF's service impacts. ..................................................................18

VI.   CONCLUSION....................................................................................................20

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Airlines, Inc. v. Wolens*,
   513 U.S. 219 (1995)...................................................................................7

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) .............................................................5

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
   660 F.3d 384 (9th Cir. 2013) ..............................................................10

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
   569 U.S. 641 (2013) .............................................................................10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................3

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ..............................................................3

*Cal. Trucking Ass'n v. Bonta*,
   996 F.3d 644 (9th Cir. 2021) ....................................................... *passim*

*California Trucking Ass'n v. Su*,
   903 F.3d 953 (9th Cir. 2018) .....................................................9, 10, 14

*Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*,
   152 F.3d 1184 (9th Cir. 1998) ......................................................10, 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................3

*Dan's City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013)............................................................................3, 4

*Dilts v. Penske Logistics, LLC*,
   769 F.3d 637 (9th Cir. 2014) ....................................................... *passim*

*Miller v. C.H. Robinson Worldwide, Inc.*,
   976 F.3d 1016 (9th Cir. 2020) ...............................................18, 19, 20

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)..................................................................4, 5, 6, 9

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .................................................................3

*Reinhardt v. Gemini Motor Transp.*,
    869 F. Supp. 2d 1158 (E.D. Cal. 2012)..............................................................6

*Rowe v. New Hampshire Motor Transport Ass'n*,
    552 U.S. 364 (2008) .......................................................................... *passim*

**Statutes**

42 U.S.C. § 7543 ....................................................................................................1, 7

49 U.S.C. § 13102(14) .............................................................................................19

49 U.S.C. § 14501(c)(1) ............................................................................... *passim*

Cal. Code Regs. tit. 13, § 2013 ..................................................................................1

Cal. Code Regs. tit. 13, § 2014 ...........................................................................2, 10

Cal. Code Regs. tit. 13, § 2014.1(a) ...............................................................1, 2, 10

Cal. Code Regs. tit. 13, § 2015(a) .............................................................2, 10, 20

Cal. Code Regs. tit. 13 § 2015(b) ...........................................................................10

Cal. Code Regs. tit. 13, § 2015(d) ............................................................................2

Cal. Code Regs. tit. 13, § 2015(g) ..........................................................................20

Cal. Code Regs. tit. 13, § 2015.1 ......................................................................2, 10

Cal. Code Regs. tit. 13, §§ 2015.3 ...........................................................................8

Cal. Code Regs. tit. 13, § 2016(c) ............................................................................2

Fed. R. Civ. P. 56(a) .................................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Facing the threat of patchwork regulation that would fracture the national trucking industry, Congress enacted the Federal Aviation Administration Authorization Act ("F4A"), which specifically prohibits state regulations "related to a price, route, or service of any motor carrier … or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). States have long respected this Congressional prohibition, avoiding regulations that directly target the trucking industry. That changed last year when the California Air Resources Board ("CARB") adopted the Advanced Clean Fleets Regulation ("ACF"). Unlike prior state emissions regulations requiring the manufacture of cleaner engines, ACF mandates that virtually all trucking operations in California phase out internal combustion engine ("ICE") vehicles, and replace them with zero-emission vehicles ("ZEVs") that are much more expensive, that have substantially less range, and for which only limited infrastructure exists. This forced conversion will directly and dramatically impact the prices, routes, and services of motor carriers, impermissibly interfering with the deregulatory objectives of F4A. As a consequence, the F4A preempts ACF.

### II.    BACKGROUND

#### A.    Advanced Clean Fleets.

CARB adopted ACF[1] on April 28, 2023.[2] ACF is designed to "accelerate the widespread adoption of zero-emission vehicles in the medium- and heavy-duty truck sector and in light-duty package delivery vehicles," to "transform the medium- and heavy-duty sector and light-duty package delivery vehicles to ZE," and – in conjunction with other CARB regulations – to "achieve a full transition to a ZE transportation system."[3] ACF consists of four regulatory subparts.[4]

First, ACF regulates "high priority fleets": fleets that (1) "own, operate, or direct the

---

[1] Cal. Code Regs. tit. 13, § 2013 *et seq.*
[2] SUF, ¶ 1. ACF's requirements are operative as of January 1, 2024. *See, e.g.*, Cal. Code Regs. tit. 13, § 2014.1(a)(1). However, under the Clean Air Act ("CAA"), CARB may not actually *enforce* ACF until it receives a waiver from the Environmental Protection Agency ("EPA"). *See* 42 U.S.C. § 7543. As of this filing, CARB has requested a waiver to enforce ACF, but EPA has yet to grant that waiver. SUF, ¶ 2.
[3] SUF, ¶ 3 (ACF Initial Statement of Reasons (August 30, 2022) ("ISOR") at 1-2 (CTA-000437-438)).
[4] Three of these are the subject of this Motion. This Motion does not address ACF's requirements for state and local government agency fleets (Cal. Code Regs. tit. 13, § 2013(d)-(e)).

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

operations of 50 or more vehicles," whether or not those vehicles operate in California; and (2) have "$50 million or more in total gross annual revenues," whether or not those revenues derive from California-based operations.[5] Thus, ACF's high priority fleets regulation (the "HPF Regulation") sweeps in any fleet whose *national* (or *international*) operations meet this threshold, regardless of how minimal that fleet's California-based operations may be.

The HPF Regulation requires all high priority fleets to shift from ICE trucks to ZEV trucks by requiring the removal of existing ICE trucks at the end of a CARB-defined useful life and mandating their replacement with ZEVs.[6] As an alternative, fleets can comply with "milestone provisions" that mandate that a certain percentage of fleet vehicles are ZEVs by target years.[7]

Second, ACF regulates the trucks used by drayage service providers – those services involving the transportation of goods from seaports or railyards to their final destination (the "Drayage Regulation").[8] As with the HPF Regulation, the Drayage Regulation mandates that, as of January 1, 2024, all newly registered drayage trucks operating in California must be ZEVs, and requires the retirement of legacy drayage trucks at the end of a CARB-defined useful life.[9] CARB has acknowledged, correctly, that these regulations "<u>aggressively</u> push[] drayage trucks to be ZE[.]"[10]

Finally, and most directly, ACF simply prohibits the sale of new medium- and heavy-duty ICE trucks in California starting in 2036 (the "2036 Sales Requirement").[11]

**B.    California Trucking Association.**

As the largest trucking trade association in California, Plaintiff California Trucking Association ("CTA") is dedicated to advancing the interests of its members – the motor carriers that provide transportation services in California.[12] CTA's members include licensed motor carrier companies that manage, coordinate, broker, and schedule the movement of property throughout

---

[5] Cal. Code Regs. tit. 13, § 2015(a)(1). This provision also applies to fleets operated by federal government agencies, *id.* at § 2015(a)(1)(D), but this Motion is not addressed to that application of ACF.
[6] Cal. Code Regs. tit. 13, § 2015.1(a)-(b).
[7] Cal. Code Regs. tit. 13, § 2015(d).
[8] Cal. Code Regs. tit. 13, § 2014 *et seq.*
[9] Cal. Code Regs. tit. 13, § 2014.1(a).
[10] SUF, ¶ 4 (ISOR at 3 (CTA-000439) (emphasis added)).
[11] Cal. Code Regs. tit. 13, § 2016(c).
[12] SUF, ¶ 5 (Declaration of Chris Shimoda ("Shimoda Decl."), at ¶ 2).

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

California.[13] ACF regulates CTA's members. Many of CTA's members provide drayage services[14] and are subject to the Drayage Regulation. Many of CTA's members qualify as high priority fleets under ACF,[15] and are therefore subject to the HPF Regulation. Some of CTA's members are subject to both sets of regulations.[16] And all of CTA's members will be impacted by the 2036 Sales Requirement, which will eliminate those members' ability to purchase, operate, or contract for the use of ICE trucks in interstate commerce.[17]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment has the initial burden of identifying the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Where the moving party meets its burden, the non-moving party must identify facts showing that a genuine issue for trial exists. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Speculative or conclusory evidence cannot defeat summary judgment. *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

## IV.    STATE OF THE LAW

In 1994, Congress enacted the F4A "to pre-empt state trucking regulation" (*Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 368 (2008)) in the same way it had preempted state regulation of the airline industry with the Airline Deregulation Act ("ADA") in 1978. *Id.* at 367-68. Because the ADA and the F4A have identical aims and use near-identical language to achieve those aims, judicial construction of the F4A is "informed by decisions interpreting the parallel language in the ADA's preemption clause." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013); *see Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 644 (9th Cir. 2014) ("By using text nearly identical to the [ADA's], Congress meant to create parity between freight services provided by air carriers and

---

[13] SUF, ¶ 6 (Declaration of Sanford J. Hodes (Ryder) ("Hodes Decl."), ¶ 2; Declaration of Peter Schneider (TGS) ("Schneider Decl."), ¶ 4; Declaration of Karen Vellutini (Devine) ("Vellutini Decl."), ¶ 2).
[14] SUF, ¶ 7.
[15] SUF, ¶ 8 (Declaration of Michael Pugh (Enterprise) ("Pugh Decl.")).
[16] SUF, ¶ 9.
[17] SUF, ¶ 10.

those provided by motor carriers. Therefore, the analysis from *Morales* and other [ADA] cases is instructive for our [F4A] analysis as well.") (citations omitted).[18]

The Supreme Court laid the foundation for all subsequent ADA and F4A jurisprudence in *Morales v. Trans World Airlines*, which concerned a state prohibition on certain airline fare advertisements. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). First, the Court explained that in interpreting the statutory language "relating to rates, routes, or services," the "ordinary meaning of these words is a broad one[, and] express a broad pre-emptive purpose. … State enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted[.]" *Id.* at 383-84 (emphasis added). Next, it determined that the state regulations restricting fare advertising were preempted, both because they directly referenced fares, and because they "would have a significant impact upon the airlines' ability to market their product, and hence a significant impact upon the fares they charge." *Id.* at 388-90. Finally, responding to concerns about the potential breadth of the ADA, the *Morales* Court cautioned that certain "tenuous, remote, or peripheral" impacts – such as "state laws against gambling and prostitution as applied to airlines" – were likely beyond the scope of ADA preemption. *Id.* at 390.

Two years after *Morales* was decided, Congress enacted the F4A, borrowing the ADA's preemption language. *See Rowe*, 552 U.S. at 367, 370 (noting that Congress "did so fully aware of this Court's interpretation of that language as set forth in *Morales*" and citing legislative history "expressing agreement with 'the broad preemption interpretation adopted … in *Morales*.'"). Writing for a unanimous Court in review of Maine's restrictions on the delivery of tobacco products under the F4A, Justice Breyer explained that the regulation "focuses on trucking and other motor carrier services (which make up a substantial portion of all 'delivery services,' … ) thereby creating a direct 'connection with' motor-carrier services." *Id.* at 371 (applying *Morales*). The Court emphasized that the regulation would negatively impact the F4A's "ability to achieve its pre-emption-related

---

[18] The Supreme Court has noted that the ADA and the F4A differ in one significant respect: "Although § 14501(c)(1) otherwise tracks the ADA's air-carrier preemption provision, … the [F4A] formulation contains one conspicuous alteration—the addition of the words 'with respect to the transportation of property.' That phrase massively limits the scope of preemption ordered by the [F4A]." *Dan's City Used Cars*, 569 U.S. at 261 (cleaned up) (emphasis added). Because there is no dispute that ACF's impacts operate on the transportation of property, however, this distinction is irrelevant for present purposes.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

objectives[,]" because it would:

> require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer). And even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future. The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide.

*Id.* at 371-72. In closing, the Court observed: "If federal law pre-empts state efforts to regulate, and consequently to affect, the advertising *about* carrier rates and services at issue in *Morales*, it must pre-empt Maine's efforts to regulate carrier delivery services themselves." *Id.* at 372. *See also id.* at 377 (Ginsburg, J., concurring) ("The breadth of the [F4A's] preemption language, … coupled with our decisions closely in point, … impel that conclusion.").

Given the plain text of the F4A, and the Supreme Court's admonitions about its breadth, it is virtually unheard of for a state agency to adopt a law that directly targets the trucking industry. *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 658 (9th Cir. 2021) ("*Bonta*") (weighing against preemption the fact that the law at issue "[did] not single out motor carriers but instead affects them solely in their capacity as employers"). As a consequence, the major part of Ninth Circuit case law applying the F4A deals not with industry-specific regulations, but rather with generally-applicable laws – primarily labor standards – as applied to the trucking industry. *See Dilts*, 769 F.3d at 641 n.1 (listing thirteen California district court decisions addressing F4A preemption of generally-applicable meal and rest break laws). In that context, courts in this Circuit have expressed skepticism that F4A preemption can reach generally-applicable laws, and so have typically rejected F4A preemption claims. *See Bonta*, 996 F.3d at 660 (9th Cir. 2021). *But see Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1053 (9th Cir. 2009) (mandatory concession agreements governing drayage carriers' hiring and employment practices were likely preempted under F4A).

This case is different. Unlike generally applicable labor regulations, ACF singles out the trucking industry. Under ACF, CARB will require that motor carriers replace trucks that enter California with ZE trucks that are much more expensive and possess greater technological limitations than ICE trucks. While CARB has long established emissions limits for the vehicles manufacturers can <u>sell</u> in California, CARB has never before prohibited the <u>use</u> of federally-compliant vehicles in

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

interstate commerce, and certainly never mandated a tectonic shift in fuel sources. ACF will necessarily yield direct impacts to motor carriers' rates, routes, and services[19] that unlawfully intrude on market forces in contravention of Congress's deregulatory mandate. Neither this Court nor the Ninth Circuit Court of Appeals has had occasion to assess, under the rubric of the F4A, such a brazenly direct statewide regulation of California's trucking industry operations. But the principles articulated in *Morales* and *Rowe* compel the conclusion that ACF is preempted by the F4A.

## V.    LEGAL ARGUMENT

Applying the F4A, the U.S. Supreme Court has instructed "(1) that state enforcement actions having a connection with, or reference to, carrier rates, routes, or services are pre-empted; (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services is only indirect; (3) that, in respect to pre-emption, it makes no difference whether a state law is consistent or inconsistent with federal regulation; and (4) that pre-emption occurs at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives." *Rowe*, 552 U.S. at 370-71 (cleaned up). "In determining whether a state law has a 'connection to' rates, routes, or services, courts examine the actual or likely effect of a State's action." *Reinhardt v. Gemini Motor Transp.*, 869 F. Supp. 2d 1158, 1165 (E.D. Cal. 2012). Further, "[p]reemption may occur even if the state law's effect is only indirect[, provided that it is] more than tenuous, remote, or peripheral." *Id.* (citing *Rowe*, 552 U.S. at 370). Finally, "[i]n borderline cases, the proper inquiry is whether the provision, directly or indirectly, binds the [motor] carrier to a particular price, route, or service and thereby interferes with competitive market forces within the ... industry." *Reinhardt*, 869 F. Supp. 2d at 1165 (citations and quotations omitted).

### A.    ACF interferes with Congress's deregulatory and preemptive objectives.

The Supreme Court has explained that "pre-emption occurs <u>at least</u> where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives[.]" *Rowe*, 552 U.S. at 371 (citing *Morales*, 504 U.S. at 390) (emphasis added). Thus, in *Rowe*, the Court explained:

---

[19] Under the F4A, impacts to any one of rates, routes, <u>or</u> services is sufficient for preemption.  *See Rowe*, 552 U.S. at 371 (finding F4A preemption based on service impact alone).

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

> [T]he law will require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer). And even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future. The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for "competitive market forces" in determining (to a significant degree) the services that motor carriers will provide.

*Id.* at 371-72 (internal citations omitted). The Court concluded: "to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations. That state regulatory patchwork is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Id.* at 373.

There can be no doubt that ACF impermissibly interferes with Congress's deregulatory objectives – to leave motor carrier operations to the marketplace, and to foreclose the emergence of a patchwork of state regulations. *Id.* As detailed in their Declarations, CTA members Ryder System, Inc. ("Ryder"), TGS Transportation, Inc. and TGS Logistics, Inc. (collectively, "TGS"), Devine Intermodal ("Devine"), and Enterprise Truck Rental, Inc. ("Enterprise") will purchase and utilize ZEV trucks solely to comply with ACF; no customer has requested that they do so, nor are these purchases responsive to broader market forces.[20] To the contrary, as discussed below, ACF's mandate seriously disrupts these motor carriers' operations, forcing them to adopt unreliable (and in many instances *unavailable*) technology[21] "simply because the State seeks to enlist the motor carrier operators as allies" in its environmental policy aims. *See Rowe*, 552 U.S. at 376; *see also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229, n.5 (1995) ("States may not seek to impose their own public policies or theories of competition or regulation on the operations of [a motor] carrier.").

ACF also promises to create an impermissible patchwork of state motor carrier regulations. Under CAA section 209 (42 U.S.C. §7543), CARB may adopt emissions regulations that are more stringent than federal standards. Historically, these regulations have applied to engine manufacturers

---

[20] SUF, ¶¶ 11-14.

[21] *See* SUF, ¶ 15 (California Energy Commission, "Senate Bill 643 Report" (Jan. 24, 2024), at 30 (CTA-001388) ("Without a high level of confidence, including transparency of infrastructure requirements, fueling standards, equipment availability and function, and uncertainty regarding the cost and reliability of infrastructure, potential developers have been cautious to invest. In parallel, OEMs have been slow to develop MDHD FCEVs in the United States.")). *See also* SUF, ¶ 43.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

---

CTA'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MSJ

7

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

and limited what engines could be sold into California. Thus, although Arizona and Nevada follow federal emissions standards, the trucks sold in those states could nevertheless operate in California. ACF now prevents those trucks from operating in California unless they meet California's ZEV standards. CARB thus precludes motor carriers from operating in California using trucks that they are permitted to use in every other state. As a consequence, carriers operating interstate routes exceeding the range of ZEV trucks will be forced to eliminate those routes, and replace them with multi-segment relay routes that are less efficient and far more expensive to operate or cease operating those routes altogether.

Moreover, under the CAA, other states may adopt California's emissions standards. This may seem to create only a binary regulatory landscape, with California and other "ACF states" on one side, and "non-ACF" states on the other. However, ACF allows for significant state-to-state variation; it vests each state's administrator with enormous discretion to grant exemptions from ACF's requirements and extensions of the time to comply with those requirements. As one example, ACF provides that fleet owners may seek a two year enforcement extension for ZEV infrastructure construction delays "due to circumstances beyond their control," and instructs that "in granting or denying the extension request, the Executive Officer will … utilize their good engineering judgment to determine whether" the extension is warranted.[22] As each new state adopts ACF, a different official will make this determination, exercising different "engineering judgment," and almost certainly reaching different conclusions about whether the extension request should be granted. Thus an official in Oregon may extend the life of an ICE truck at the same time CARB prohibits it. ACF is replete with these discretionary decisions,[23] making it certain that implementation will vary significantly from state to state. The broader adoption of ACF threatens a completely unworkable, impermissible patchwork of state-specific regulations that Congress expressly sought to avoid with F4A.

---

[22] Cal. Code Regs. tit. 13, § 2015.3(c)(1) (emphasis added).

[23] *See, e.g.*, Cal. Code Regs. tit. 13, §§ 2015.3(b)(6) (providing that Executive Officer shall "utilize their good engineering judgment" to determine whether requirements are met for exemption to purchase new ICE vehicles where "no new BEV is available … that can meet the demonstrated daily usage needs" of existing fleet vehicles), 2015.3(d)(4) (Executive Officer shall "utilize their good engineering judgment" to determine whether to grant exemption related to vehicle delivery delays).

**B.    ACF impermissibly impacts rates, routes, and services.**

Under F4A, "state enforcement actions having a connection with, or reference to, rates, routes, or services are pre-empted, and such pre-emption may occur even if a state law's effects on rates, routes, or services is only indirect." *Rowe*, 552 U.S. at 370 (cleaned up).

*1.    As ACF is an industry-specific regulation, ACF's impacts are "significant."*

In holding that industry-specific advertising restrictions had a "significant impact" upon prices, the *Morales* Court took care to explain that certain generally applicable state laws – such as those "against gambling and prostitution" – would affect rates, routes, and services "in too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Morales*, 504 U.S. at 390 (quotations omitted). Likewise, the *Rowe* Court distinguished between tobacco delivery restrictions that "focuse[d] on trucking," and other "general" laws that would "affect truckers solely in their capacity as members of the general public[.]" *Rowe*, 552 U.S. at 371, 375.

Thus, in assessing whether a given law has a "tenuous" (non-preempted) impact or a "significant" (preempted) impact, courts must consider whether the law is generally applicable or industry-specific. Following these principles, the Ninth Circuit has explained that "[a] law's general applicability, while not dispositive, 'will likely influence whether the effect on prices, routes, and services is tenuous or significant.'" *Bonta*, 996 F.3d at 656 (quoting *California Trucking Ass'n v. Su*, 903 F.3d 953, 966 (9th Cir. 2018)). In other words, the question of general applicability is a predicate to, and informs the outcome of, the "prices, routes, and services" analysis. *See Bonta*, 996 F.3d at 658 ("We <u>first consider</u> whether AB-5 is generally applicable, because this determination 'will likely influence whether the effect on prices, routes, and services is tenuous or significant.'") (emphasis added) (citations omitted).

As discussed above, virtually all of the Ninth Circuit F4A jurisprudence concerns generally-applicable laws, typically labor standards. Applying F4A in that context, the Ninth Circuit has rigorously examined – and dismissed as insufficient – alleged impacts on rates, routes, and services. *See Bonta*, 996 F.3d at 660 (requirement to classify drivers as employees rather than independent contractors produced insufficient impacts); *Su*, 903 F.3d at 961 (same); *Dilts*, 769 F.3d at 649 ("minor

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    [route] deviations" required to comply with meal and break law were insufficient); *Californians For*

2    *Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998) (cost

3    increases occasioned by prevailing wage law were insufficient). In each case, however, the Ninth

4    Circuit has emphasized that its conclusion was influenced by the fact that the law at issue was

5    generally applicable. *See Bonta*, 996 F.3d at 658-59; *Su*, 903 F.3d at 961; *Dilts*, 769 F.3d at 647;

6    *Mendonca*, 152 F.3d at 1189, n.6.

7            Whereas the laws discussed above were generally applicable regulations with only peripheral

8    impacts on trucking, ACF is an express trucking regulation with only peripheral general impacts.

9    Like the regulation in *Rowe*, there can be no question that ACF "focuses on trucking." ACF expressly

10   applies to the fleet owner or "controlling party," meaning the "motor carrier" or "broker."[24] And it

11   expressly targets the means by which the motor carriers and brokers offer their services. [25] Notably,

12   neither the Ninth Circuit nor this Court have ever had occasion to consider an industry-specific

13   regulation such as ACF, or to apply F4A in that context.[26] As detailed below, both CARB's own

14   analysis and the experiences of CTA's members substantiate the obvious conclusion: that ACF's ZEV

15   mandate will directly and dramatically impact the rates charged by motor carriers, the routes that they

16   can use, and the services that they provide. Given the fact that ACF is an industry-specific regulation,

17   these impacts are presumed "significant," and therefore preempted. *See Bonta*, 996 F.3d at 658-59.

18           2.    *CARB's acknowledged ACF cost impacts.*

19           To comply with ACF, motor carriers will purchase either (1) battery-electric vehicle ("BEV")

20   trucks, which run on electricity stored in an on-board battery recharged at an electric charging station,

21   or (2) fuel cell electric vehicle ("FCEV") trucks, which power batteries with hydrogen fuel and refuel

22

23

24   [24] Cal. Code Regs. tit. 13 §§ 2014(b), 2014.1(a)(6), 2015(a)(1)(C), 2015(b).

     [25] Cal. Code Regs. tit. 13, §§ 2014.1(a), 2015.1(a)-(b); *see* SUF, ¶ 16 (ISOR at 3 (CTA-00439) ("The

25   purpose of the proposed ACF regulation is to accelerate the widespread adoption and usage of ZEVs in the
     medium- and heavy-duty truck sector and light-duty vehicles used in mail and package delivery, to reduce

26   harmful emissions generated from on-road mobile sources.") (emphasis added)).

     [26] The Ninth Circuit previously considered whether the City of Los Angeles may regulate the trucks that visit

27   its ports through concession agreements. *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d
     384 (2013). The provisions that ultimately survived preemption under F4A (*e.g.*, requiring trucks to be

28   maintained per manufacturer's instructions) bear no resemblance to the magnitude and breadth of ACF. *Id.* at
     403-406; *see also American Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 655 (2013).

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

at a hydrogen fueling station.[27] CARB's rulemaking documents lay out the enormous expenses associated with each compliance pathway.

Regarding the **expense of purchasing ZEV trucks**, CARB admits that "[t]oday and for the foreseeable future, BEVs and FCEVs will cost more upfront than their combustion-powered counterparts. This is due to a combination of higher vehicle prices as well as additional infrastructure costs."[28] Thus, CARB projects – using the language of F4A – that "the increased capital expenditure associated with ZEVs will have an impact on fleets during this transition."[29] CARB acknowledges that "[n]ew vehicle prices for ZEVs are expected to be higher than their combustion counterparts for the near future due to the more costly components needed for their manufacture. BEVs require a battery and FCEVs require hydrogen tanks and fuel cell stacks, both of which increase the vehicle's overall price."[30] CARB predicted (for example) that a new Class 8 Day Cab diesel truck will cost $145,689 in 2025, compared to a comparable new BEV truck at $204,579 (40% more expensive), and a comparable new FCEV truck at $221,352 (52% more expensive).[31]

The cost impact of ACF compliance is hardly limited to purchasing ZEVs, however. Covered carriers must also purchase more expensive fuel to power these trucks, pay to develop their own charging infrastructure, and incur significant additional expenses related to insurance, training, and the like. CARB acknowledges each of these cost categories. Regarding the **expense of fueling ZEV trucks**, CARB's analysis reveals that fueling costs will significantly increase relative to diesel fuel. For example, CARB estimates diesel fuel costs $4 per gallon in 2024, and states that Class 8 Day Cab diesel trucks purchased that year will travel 6.9 miles per gallon.[32] Assuming this is accurate, such a truck would require 29 gallons of diesel fuel – at a cost of approximately $116 – to travel 200 miles.

---

[27] SUF, ¶ 17 (ISOR at 69 (CTA-000511) ("BEVs and FCEVs are the most common examples of currently available ZEVs and are the foundation of staff's proposed ACF regulation.")).
[28] SUF, ¶ 18.
[29] SUF, ¶ 18 (emphasis added).
[30] SUF, ¶ 18.
[31] SUF, ¶¶ 19-20. Of course, a comparison between new ZEVs and new diesel trucks fails to tell the whole story, because (absent ACF) motor carriers would have no obligation to replace their entire fleet with new diesel trucks to continue their existing operations. Instead, they would simply use their existing trucks through the end of their operational lives. In other words, the relevant cost differential is not new ZEV trucks v. new diesel trucks, but instead new ZEV trucks v. existing diesel trucks that motor carriers already purchased.
[32] SUF, ¶ 21.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

That figure pales in comparison to the costs associated with fueling ZEV trucks. The cost to refuel FCEVs is particularly daunting. CARB estimates a 2024 hydrogen fuel price of $16 per kilogram, and projects that FCEV trucks purchased in 2024 will travel 10.9 miles per kilogram.[33] Thus an FCEV trucks will require 18.35 kilograms of hydrogen fuel – at a cost of $294 – to travel 200 miles. In other words, even assuming CARB's optimistic projections are true, <u>it will cost more than 2.5 times as much to fuel a FCEV truck than to fuel a diesel truck.</u>

The cost associated with fueling BEV trucks is only slightly less harrowing. Here, CARB distinguishes between BEV trucks that utilize retail (publicly-available) charging versus those that use depot (in-house) charging.[34] For those BEV trucks relying on retail charging, CARB's figures again reflect a higher fuel cost relative to diesel: $.36 per kilowatt hour, with a fuel efficiency of .5 miles per kilowatt hour, means that it will cost $144 to fuel a Class 8 Day Cab BEV for a 200-mile trip – a 25 percent increase over diesel.[35] CARB does project a lower cost relative to diesel when using depot charging: $.16 per kilowatt hour at the same fuel efficiency works out to a cost of $64 for a 200-mile trip.[36] But critically, to achieve these savings, motor carriers must pay to develop their own charging infrastructure – in CARB's words: "Fleets owning BEVs that do not use retail charging would set up private, behind-the-fence facility-side infrastructure to recharge their vehicles."[37]

Thus, BEV operators seeking to avoid the increased costs associated with retail charging will instead be required to bear the **expense of developing charging infrastructure**; CARB acknowledges that these expenses will be borne by the carriers themselves as "an upfront capital investment needed prior to vehicles being deployed[.]"[38] Here, for each new Class 8 BEV that motor carriers are required to buy under ACF (at a cost of $204,579[39]), CARB estimates that carriers will also need to expend $37,500 per vehicle on new BEV chargers, and $44,000 per vehicle to upgrade

---

[33] SUF, ¶¶ 22-23.
[34] SUF, ¶ 24. CARB estimates that 25 percent of class 8 day cab BEVs will utilize retail charging, with the remaining 75 percent using depot charging. SUF, ¶ 24.
[35] SUF, ¶ 25.
[36] SUF, ¶ 26.
[37] SUF, ¶ 27.
[38] SUF, ¶ 27.
[39] SUF, ¶ 28.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1  existing infrastructure.[40] Of course, it is not enough for carriers to simply purchase and install this

2  infrastructure – they must first undertake extensive permitting and planning efforts which CARB

3  itself admits "can often take from 6-18 months."[41] Until that process is complete, BEV fleet operators

4  will be forced to incur the higher fuel costs associated with retail charging, detailed above.[42]

5      CARB projects that ACF, a regulation that directly and expressly regulates motor carriers and

6  brokers, will cost up to $680 million per year over the next decade.[43] Even assuming CARB's

7  estimates are accurate, ACF represents an impermissible regulation related to prices, routes, and

8  services under F4A.

9      3.    _ACF's actual impacts on motor carrier costs._

10     Though CARB's estimates alone demonstrate an impermissible rate impact, in reality, the

11  cost of compliance with ACF is far greater than CARB's rose-tinted projections. For example, CTA

12  member TGS intends to comply with ACF through the purchase of FCEVs, because it cannot

13  maintain its existing routes using BEV trucks.[44] To that end, TGS has placed an order for two FCEV

14  trucks, at a purchase price of <u>$786,630.24</u> per truck.[45] That is <u>more than triple</u> CARB's assumed

15  expense of $221,352, and <u>more than five times</u> the cost (according to CARB) of a comparable new

16  diesel truck.[46] So, on top of the increased costs associated with fueling FCEVs, developing FCEV

17  charging infrastructure, and the various other training, insurance, and miscellaneous expenses that

18  ACF will necessitate, TGS will be forced to replace its entire fleet with new trucks that are five times

19  more expensive than ICE trucks.

20     TGS currently nets a profit of 5-10 percent annually.[47] At present, its largest cost categories

21  are purchasing diesel fuel (roughly 30-35 percent of total costs), wage-related costs (30-35 percent of

22

23  [40] SUF, ¶ 29.
   [41] SUF, ¶ 30.

24  [42] The ISOR also details numerous other costs, including those associated with insuring ZEV trucks,
   transitioning to ZEV technology, workforce training, compliance reporting, and taxes and fees. SUF, ¶¶ 31-

25  33.
   [43] SUF, ¶ 34.

26  [44] SUF, ¶ 35.
   [45] SUF, ¶ 36. That figure rises to a total sales price of $952,714.09 after the inclusion of fees, federal excise

27  tax, and state sales tax. SUF, ¶ 36.
   [46] SUF ¶¶, 19-20.

28  [47] SUF, ¶ 37.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

total costs), and purchasing and maintaining its ICE truck fleet (roughly 15-20 percent of total costs).[48] Under ACF, two of those three categories will explode. By CARB's own admission, it is 2.5 times more expensive to fuel a FCEV truck than a diesel truck.[49] This increase alone would render TGS unprofitable if its current rates remain the same – and that is before factoring in the astronomical expense of replacing its fleet of 40 ICE trucks with FCEV trucks at $780,000 per truck.[50] In total, TGS estimates that compliance with ACF will increase its operating expenses by 75-100 percent, and that it will need to raise the rates it charges the same amount in order to remain profitable.[51]

Other CTA members will face similar cost increases. CTA member Devine expects to purchase BEVs or FCEVs costing $350,000 and $750,000 respectively to comply with ACF, ████ ████████████████████████████████████████████.[52] This dramatically increased cost, along with the cost of new infrastructure, will ultimately be passed on to Devine's customers in the form of increased rates.[53] CTA member Ryder estimates that the replacement of Class 8 trucks in California and the capital to develop charging depots at its facilities and along key routes will result in a 94% increase in total cost to transport, and it too will pass these costs to its customers.[54]

Whether relying on CARB's optimistic projections or the experience of CTA members, ACF has a direct and significant impact on the prices that those members charge. F4A preempts laws that cause such impacts. *Rowe*, 552 U.S. at 370-71. And while the Ninth Circuit has repeatedly held that "modest increases in business costs" caused by generally-applicable laws do not trigger F4A preemption (*see, e.g.*, *Su*, 903 F.3d at 965; *Dilts*, 769 F.3d at 648), those cases are readily distinguishable. First, ACF is not a generally-applicable law, but specifically targets the trucking industry. *See Bonta*, 996 F.3d at 656 ("[a] law's general applicability, while not dispositive, 'will likely influence whether the effect on prices, routes, and services is tenuous or significant.'") (quotations omitted). And second, these increases are not modest. They are enormous. *Compare* SUF,

---

[48] SUF, ¶ 38.
[49] SUF ¶¶, 21-23.
[50] SUF, ¶ 36.
[51] SUF, ¶ 39.
[52] SUF, ¶ 40.
[53] SUF, ¶ 40.
[54] SUF, ¶ 41.

¶ 39 (75-100% total cost increase), SUF, ¶ 41 (94% increase in cost to transport), *and* SUF ¶ 40 ███

███████████, *with Mendonca*, 152 F.3d at 1189 (assessing 25% alleged cost increase due

to prevailing wage law).

### 4.   *ACF's route impacts.*

In addition to the cost impacts detailed above, ACF will also impermissibly impact motor

carriers' routes. Put simply, the mandated transition to ZEV trucks will require motor carriers to

change or abandon existing routes, due to either insufficient infrastructure or inadequate technology.

CARB recognizes that ICE vehicles "enjoy an inherent advantage … due to their established

footprint" around which duty cycles and other core business practices, including routes, are

designed.[55] ACF interferes with this dynamic by introducing new technological hurdles related to

vehicle range, refueling/recharging time, and availability of refueling/recharging infrastructure.

Motor carriers complying with ACF using FCEV trucks for their similar range and fueling

times to ICE trucks will face a near-total absence of adequate hydrogen stations – the most recent

CEC analysis reflects that there are only <u>three</u> retail stations deployed in California that offer

hydrogen refueling for medium and heavy-duty operations.[56] So, these motor carriers will either need

to abandon their existing routes due to the lack of hydrogen infrastructure, or instead shoulder the

enormous expense of a private network of charging infrastructure.[57] In other words, ACF will force

these motor carriers to choose between impermissible route impacts, or impermissible cost impacts.

Conversely, motor carriers choosing BEV trucks for their modestly more developed charging

infrastructure and vehicle availability must grapple with longer charging times measured in hours and

severely limited range.[58] BEV motor carriers thus face a choice: dramatically alter their current routes

---

[55] SUF, ¶ 42.

[56] SUF, ¶ 44. *See also* SUF, ¶ 43 (FSOR at 242 (CTA-000283) ("CARB and CEC also participate in joint efforts through … SB 643 (requires preparation of a statewide assessment of hydrogen fueling infrastructure and fuel production needed to support the adoption of fuel cell trucks). The findings of these assessments will help guide future charging and hydrogen infrastructure investment.")).

[57] SUF, ¶ 45 (FSOR at 191 (CTA-000232) ("In most cases, fleets are expected to initially install their own infrastructure and potentially rely on public or retail fueling infrastructure as ZEV deployments expand.")). CARB did not separately estimate the costs associated with developing FCEV charging infrastructure, instead incorporating those costs into their hydrogen fuel cost projections – again, 2.5 times the price of diesel fuel. SUF, ¶¶ 46; 21-23.

[58] Regarding the range of BEVs, CARB states: "Currently, medium- and heavy-duty BEVs with nominal ranges of 100-200 miles per charge are commonly available. A few models are available with a range over

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

by breaking them into smaller segments or eliminate them altogether.

CTA member Ryder plans to comply with ACF through the purchase of BEVs.[59] One-third of its existing routes in California exceed 200 miles (the maximum range of "commonly available" BEVs identified by CARB).[60] Rather than delaying the delivery of cargo by halting it at charging stations for hours at a time, Ryder will need to convert all of these routes to "relay" routes that are performed by multiple drivers and multiple trucks.[61] To analogize to air travel, it is the equivalent of eliminating all direct flights between San Francisco and Los Angeles, and instead requiring all flights traveling between these two cities to have a layover in Bakersfield.

The burdens of ACF are so heavy, and the limitations of BEV trucks so severe, that Ryder intends to only use the technology when mandated in California. Its interstate routes will thus be heavily disrupted. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.[62]

---

300 miles." SUF, ¶ 49 (ISOR at 69 (CTA-000511)). In the ISOR, CARB projected that BEV fleets lacking home base charging would depend on high-speed public charging infrastructure, capable of charging a vehicle in 1-3 hours. SUF, ¶ 50. However, data from the CARB-funded Zero-and Near-Zero-Emission Freight Facilities Project indicated average daily charging times of 4.7 hours. *See* SUF, ¶ 52 (Declaration of Marne Sussman ("Sussman Decl."), at ¶ 13); (CARB, "LCTI: Flexible Solutions for Freight Facilities – San Joaquin Valley Zero and Near-Zero Emission Enabling Freight Project" (CTA-000892) (Additional Resources: Drayage Truck Report)); SUF, ¶ 51 (BNSF Railway, "BNSF Zero-and Near-Zero Emission Freight Facilities Project (ZANZEFF) Data Acquisition Support – Topical Report: Drayage Truck," at 23 (CTA-000926)).

[59] SUF, ¶ 47.
[60] SUF, ¶¶ 48-49.
[61] SUF, ¶ 53.
[62] SUF, ¶ 53.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

CTA member Enterprise's routes will also be impermissibly impacted. Enterprise rents ICE trucks to customers – ███████████████████████████████████ – to use for various delivery services.[63] Currently, those customers can use Enterprise ICE trucks to perform their services on virtually any road in the state, due to the ubiquity of gas/diesel stations.[64] ACF will change this – ████████████████████████████████████████████████████████████████████████████ ██████████████████████[65] Those 300+ mile routes that lack ZEV charging infrastructure will necessarily be eliminated, while 300+ mile routes *with* ZEV charging infrastructure will confront lengthy charging times.[66]

F4A prohibits state regulations that have a "significant impact" – directly or indirectly – on motor carriers routes. *Rowe*, 552 U.S. at 370. "Routes generally refers to point-to-point transport and courses of travel." *Dilts*, 769 F.3d at 649 (cleaned up). As shown above, ACF will dramatically impact motor carriers' point-to-point transport of goods, eliminating routes exceeding ZEV truck range and, at best, replacing them with numerous inefficient and costly shorter routes.

The Ninth Circuit's discussion in *Dilts* illustrates the line between permissible and impermissible route impacts under F4A. In that case, the court considered whether California's (generally-applicable) meal and break laws generated route impacts because they required "that

---

[63] SUF, ¶ 54.
[64] SUF, ¶ 55.
[65] SUF, ¶ 56.
[66] SUF, ¶ 56.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

1    drivers pull over and stop for each break period[.]" *Dilts*, 769 F.3d 649. The Court reasoned that F4A

2    did not prohibit "minor deviations … such as pulling into a truck stop," and reasoned that "[t]he

3    requirement that a driver <u>briefly</u> pull on and off the road during the course of travel does not

4    meaningfully interfere with a motor carrier's ability to select its starting points, destinations, and

5    routes." *Id.* (emphasis added).

6        ACF's effects are anything but brief. Routes will be extended by hours of charging every 200

7    miles, will be broken across state lines, and will be wholly eliminated. These are not the "minor

8    deviations" accepted in *Dilts*. F4A forbids such impacts.

9                   5.    <u>*ACF's service impacts.*</u>

10       ACF will also require motor carriers to radically restructure the services they offer, force them

11   to cease offering currently-available services, and restrict the parties with whom they contract, all of

12   which are impermissible and preempted impacts. While the Ninth Circuit has been clear that service

13   changes driven by generally applicable laws are not preempted, a rule that "seeks to hold a broker (or

14   motor carrier) liable at the point at which it provides a service to its customers is directly (and

15   significantly) related to rates, routes or services, and [is] thus preempted." *Bonta*, 996 F.3d at 657

16   (citing *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1024 (9th Cir. 2020)). ACF attaches

17   liability at the point that motor carriers and brokers provide services to their customers—at the

18   selection of trucks and fleets. By penalizing the use of ICE trucks in California, ACF impermissibly

19   compels changes to motor carrier services by eliminating services offered today and requiring

20   services which the market does not demand.

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████.[67] Enterprise Truck has rental facilities in all states that border California – 9 truck rental

24   facilities in Oregon, 8 in Nevada, and 11 in Arizona; of these 28 locations, 10 are less than an hour's

25   drive to the California border.[68] ████████████████████

---

[67] SUF, ¶ 57.
[68] SUF, ¶¶ 58-59.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

███████████████████████████████████[69] This is a direct interference in the services Enterprise provides to its customers due solely to ACF.

Conversely, ACF will require CTA members to offer services that the market does not currently demand – the provision of ZE trucks. All of CTA's members have explained that there is no significant market demand for ZE trucks from their customers.[70] In *Rowe*, the court was clear that a regulation that "require[s] carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" is preempted. *See Rowe*, 552 U.S. at 371-72. ACF would do just that by requiring entities that rent vehicles that are part of their California fleet to offer for rent ZEVs, whether or not the market demands this service. As in *Rowe,* ACF would also "freeze into place services that carriers might prefer to discontinue in the future." *Id.* at 372. In this way, CARB has meddled with competitive market forces in the exact way Congress intended to preempt with F4A.

Unlike the generally applicable background laws, ACF seeks to regulate "the type of 'public utility' service that falls squarely within the scope of [F4A]." *Miller*, 976 F.3d at 1025. In *Miller*, the court considered whether subjecting a broker to liability for its contractor's negligent driving constituted a service impact under F4A. *Miller*, 976 F.3d at 1020-21. Focusing on "the point at which the law affects a broker (or motor carrier's) business," the *Miller* Court concluded that it did: "Here, as Miller concedes, the 'selection of motor carriers is one of the core services of brokers.' … Because Miller's negligence claim seeks to interfere at the point at which C.H. Robinson 'arrang[es] for' transportation by motor carrier, it is directly 'connect[ed] with' broker services[.]" *Id.* at 1023-24. Just as the selection of its motor carrier is core to the service of a broker, the selection of the motor vehicle is core to the service of a motor carrier. The *Miller* Court reasoned that the selection of service was core to the services of a broker by considering the definition – a broker under the F4A is a person that arranges for transportation by a motor carrier. *Id.* at 1024. The selection of the motor carrier was thus "squarely  within the scope of" the F4A. *Id.* at 1025. Similarly, the F4A defines a motor carrier

---

[69] SUF, ¶ 57.
[70] SUF, ¶¶ 11-14.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

as a "person providing motor vehicle transportation for compensation."[71] The selection of the motor vehicle provided must similarly be core to the motor carrier's service. By imposing additional conditions on the selection of that vehicle, ACF runs afoul of F4A.

Moreover, the Ninth Circuit has been clear that a state may not interfere with the services offered by brokers. ACF mandates that brokers exclusively hire ACF-compliant fleets in California.[72] This requirement impedes the services provided by CTA's members who are also brokers. CTA member TGS, for example, contracts with 100-150 independent contractors annually to provide drayage services for TGS's customers.[73] CTA members Devine and Ryder are also brokers who may contract for motor carrier services.[74] ACF will require TGS, Devine, and Ryder to conduct an additional level of diligence before selecting a service provider who may enter California. Just as the plaintiff in *Miller* sought to regulate the provision of services by requiring inspection of each motor carrier's safety record (*Miller*, 976 F.3d at 1021), CARB seeks to regulate the provision of services by brokers by requiring that brokers "verify that each fleet it hires or dispatches to operate in California is … a compliant fleet."[75] ACF thus dictates CTA's members' "selection of motor carriers" – "one of the core services of brokers" – by precluding them from selecting motor carriers with federally-compliant ICE fleets. A clearer violation of F4A preemption is difficult to imagine.

Because ACF impermissibly "interfere[s] at the point that a carrier provides services to its customers," *Dilts*, 769 F.3d at 649, and "imposes an obligation on brokers at the point at which they arrange for transportation by motor carrier," *Miller*, 976 F.3d at 1024, it is preempted by F4A.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant the Motion and the relief sought therein.

//

//

//

---

[71] 49 U.S.C. § 13102(14).
[72] Cal. Code Regs. tit. 13, §§ 2015(a)(3), (b) (definition of "broker"), (g).
[73] SUF, ¶ 60.
[74] SUF, ¶¶ 61-62.
[75] Cal. Code Regs. tit. 13, § 2015(g).

1

Dated: November 4, 2024

HOLLAND & KNIGHT LLP

2

3

_Marne S. Sussman_

Marne S. Sussman

4

5

Attorneys for Plaintiff CALIFORNIA TRUCKING
ASSOCIATION

6

7

8

9

10

11

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 560 Mission Street, Suite 1900, San Francisco, California 94105.

I served the foregoing document on all counsel of record in this action as follows:

**[X] (BY Electronic Transfer to the CM/ECF System)** In accordance with Federal Rules of Civil Procedure 5(d) (3), Local Rule 5-4, and the U.S. District Court of the Eastern District's General Order governing electronic filing, I uploaded via electronic transfer a true and correct copy scanned into an electronic file in Adobe "pdf" format of the above-listed documents to the United States District Court Eastern District of California' Case Management and Electronic Case Filing (CM/ECF) system on this date. It is my understanding that by transmitting these documents to the CM/ECF system, they will be served on all parties of record according to the preferences chosen by those parties within the CM/ECF system. The transmission was reported as complete and without error.

**[ ] E-MAIL:** Based on an agreement of the parties to accept service by e-mail, I caused the document(s) to be sent to the person(s) at the e-mail address(es) indicated below.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on January 30, 2025, at San Francisco, California.

*/s/ Philip Dobbs*
Philip Dobbs

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910